UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PAUL GRONDAL, a Washington resident; and THE MILL BAY MEMBERS ASSOCIATION, INC.,  a Washington Non-Profit Corporation,<br><br>    Plaintiffs,<br><br><br>   vs.<br><br><br>UNITED STATES OF AMERICA; US DEPARTMENT OF INTERIOR; BUREAU OF INDIAN AFFAIRS, et. al.,<br><br>    Defendants. | NO.    CV-09-0018-JLQ<br><br><br>**MEMORANDUM OPINION and ORDER ON DISPOSITIVE MOTIONS** |

## I.  INTRODUCTION

Pending before the court are six motions:  Federal Defendants' Motion to Dismiss and Motion for Summary Judgment (Ct. Rec. 70); Plaintiffs' First Motion for Summary Judgment re: Contract Terms (Ct. Rec. 77); Plaintiffs' Second Motion for Summary Judgment re: Settlement Agreement (Ct Rec. 79); Plaintiffs' Third Motion for Summary Judgment re: Estoppel (Ct. Rec. 81); Plaintiffs' Fourth Motion for Summary Judgment re: Arbitrary and

Capricious Action and Due Process Violation by BIA (Ct. Rec. 83); Plaintiffs' Fifth Motion for Summary Judgment re: Actual Notice of Option to Renew (Ct. Rec. 85).

On October 29, 2009 the court heard oral argument on all motions. Appearing on behalf of Plaintiffs were James Danielson and Kristin Ferrera. Appearing on behalf of Defendants the United States of America, the United States Department of Interior, and the Bureau of Indian Affairs ("the Federal Defendants") was Pamela DeRusha. Appearing on behalf of the Confederated Tribes of the Colville Reservation was Timothy Woolsey.

None of the individually named Defendants who have ownership interests in the real property known as MA-8 appeared. The court notes that the United States has not entered an appearance on behalf of any of the named individual Indian landowners. The court does not know why such an appearance has not been filed since the United States actually *granted* the Master Lease (as opposed to simply approving it) on behalf of at least certain landowners pursuant to its authority under 25 C.F.R. § 162.601.[1]   More importantly, 25 U.S.C. § 175

---

[1]  25 C.F.R. § 162.601 provides in relevant part:

(a) The Secretary may grant leases on individually owned land on behalf of:
    (1) Persons who are non compos mentis;
    (2) Orphaned minors;
    (3) The undetermined heirs of a decedent's estate;
    (4) The heirs or devisees to individually owned land who have not been able to agree upon a lease during the three-month period immediately following the date on which a lease may be entered into; provided, that the land is not in use by any of the heirs or devisees; and
    (5) Indians who have given the Secretary written authority to execute leases on their behalf.
(b) The Secretary may grant leases on the individually owned land of an adult Indian whose whereabouts is unknown, on such terms as are necessary to protect and preserve such property.
    ...

MEMORANDUM OPINION - 2

provides that "[i]n all States and Territories where there are reservations or allotted Indians the United States district attorney shall represent them in all suits at law and in equity," although the statute is not mandatory. *Siniscal v. United States*, 208 F.2d 406, 410 (9th Cir.1953)(holding that 25 U.S.C.A. § 175 is not mandatory and that its purpose "is no more than to <u>insure the Indians adequate representation in suits to which they might be parties</u>.") Unlike this case, in *Siniscal*, the Indians named were being sued as individuals and "not with reference to any right in which the United States...is in the position of trustee or guardian." *Id*. At least one court has recognized where there is a possible conflict of interest between the Indians and the United States, it may be proper for the Indians to be represented by private counsel. *State of New Mexico v. Aamodt*, 537 F.2d 1102, 23 Fed. R. Serv. 2d 810 (10th Cir. 1976). The United States has not provided any reason for its failure to enter an appearance on behalf of the un-represented individual Indian landowners to make certain they have adequate representation in this action.

The six motions before the court are in essence cross-motions for summary judgment. The Federal Defendants' motion seeks summary judgment on their counterclaim for ejectment of the Plaintiffs' from their occupancy of the real property known as MA-8. Plaintiffs' motions seek dismissal of the Federal Defendants' counterclaim. Plaintiffs' motions also seek summary judgment on their five causes of action, all seeking declaratory judgment that the Plaintiffs have the legal right to use and occupy the Mill Bay Resort (located on MA-8) through the year 2034. Federal Defendants' seek dismissal of Plaintiffs' five causes of action seeking declaratory judgment based upon a lack of jurisdiction and for failure to state a claim. The Federal Defendants take the position that the Plaintiffs' right to occupy the Mill Bay Resort expired on February 2, 2009 pursuant to the terms of the MA-8 Master Lease.

## II. STATEMENT OF FACTS

Plaintiffs are occupants of the Mill Bay Resort which exists on real property known as Moses Allotment No. 8, also known as Indian Allotment 151-MA-8 ("MA-8"). MA-8

MEMORANDUM OPINION - 3

consists of approximately 174.26 acres on the shores of Lake Chelan in Chelan County, Washington. While the record does not contain a chronology of the conveyance history of the property, evidence in the record reflects that the property was originally designated as part of the Columbia (or Moses) Reservation created by Executive Order in 1879, but then subsequently the reservation passed out of existence and the property was allotted under the General Allotment Act of 1877. Ct. Rec. 90, Ex. 13. The MA-8 property was allotted to Wapato John in 1907 pursuant to an agreement between the Moses Band of Indians and the Secretary of the Interior. The trust patent issued by the United States for the MA-8 property provided that it was to be held in trust for Wapato John or his heirs for ten years, and then to be conveyed in fee "free of all charge or incumbrances." Ct. Rec. 90 at 178.

Upon the death of Wapato John, his interest in MA-8 passed in undivided interests to his heirs. Thereafter, interests in MA-8 continued to pass pursuant to inheritance, probate proceedings and by purchase. By the 1980s, the beneficial ownership interest of Wapato John's heirs had fractioned into many interests. Most (but not all) were still held in trust status (e.g. had Indian landowners). A small percentage of MA-8 is non-Indian land owned in fee.[2] Ct. Rec. 90, Ex. 103. It is undisputed that the portion of MA-8 at issue is trust property, held in trust by the United States and administered by the U.S. Department of Interior, Bureau of Indian Affairs ("BIA"). The local department of the BIA is known as the Colville Agency.

a. *The Master Lease*. In 1979, an Indian landowner named William Wapato Evans, Jr., ("Evans") held an approximate 5.4% beneficial ownership interest in MA-8. Evans desired to lease the entire parcel (which was largely undeveloped at that time) from his co-owners for a development.

---

[2] A 1984 BIA memorandum states the allotment at that time consisted of 97% trust interest. Ct. Rec. 90, Ex. 20 at 211-212.

MEMORANDUM OPINION - 4

In 1982, Evans began negotiating a 25-year lease of MA-8 from the then existing individual landowners, and eventually obtained approval for his proposed lease from additional individual heirs of MA-8 representing a total of approximately 64% of the ownership interests.  Ct. Rec. 90, Ex. 15.  It is undisputed the BIA had "guardianship signatory authority" for the remaining minority number of allottees pursuant to 25 C.F.R. § 162.601.  The BIA consented to the lease on behalf of the rest of the trust interests pursuant to this regulatory authority. On February 2, 1984, the BIA approved Lease No. 82-21 (the "Master Lease") between Evans and his Indian co-owners.

b. *Parties to the Master Lease*. The master lease defines the "Lessee" as Evans, and the "Lessor" as individuals whose names and addresses were to be listed in an attached "Exhibit A."  There is no "Exhibit A" of record and no evidence in the record whether "Exhibit A" ever existed.   The Master Lease contains just two signatures.  It was signed by Evans as "Lessee" and under "Lessor" was the signature of George Davis, Secretary of the BIA.  No landowner signed the lease.

The Master Lease provided income in the form of rent to the beneficial owners of MA-8.

c. *Stated Purpose.*  The Master Lease provides for the use of the property for the "purpose of a recreational development and related activities."  Ct. Rec. 90 at 31 [Ex. 1 at ¶ 6]. At the time the Master Lease was signed it was contemplated that  portions of the leased property would be "allocated to recreational vehicles on a 'right to use' basis."  *Id*. at 29 [Ex. 1, ¶ 4(b)].

d. *Renewal*. The Master Lease contains the following provisions regarding renewal:

3. TERM-OPTION TO RENEW
The term of this lease shall be twenty-five (25) years, beginning on the date that the lease is approved by the Secretary.

This lease may be renewed at the option of the Lessee for a further term of not to exceed twenty=five [sic] (25) years, commencing at the expiration of the original term, upon the same conditions and terms as are in effect at the expiration of the original term, provided that notice of the exercise of such option shall be given by the Lessee to the Lessor and the Secretary in writing at lease [sic] twenve [sic] (12) months prior to said expiration of original term.

MEMORANDUM OPINION - 5

Ct. Rec. 90, Ex. 1, ¶ 3.  The notice provision of the Master Lease provided that all "notices, payments, and demands shall be sent to either party at the address herein recited or to such place as the parties may hereafter designate in writing.  Notices and demands shall be served be [sic] certified mail, return receipt requested...Copies of all notices and demands shall be sent to the Secretary in care of the office of the [BIA]...All notices to Lessor shall be sent to the landowners.  The Secretary shall furnish Lessee with the current names and addresses of Lessor upon the request of Lessee."  Ct. Rec. 90 at 49.   According to this provision, the deadline for exercising the option to renew was February 1, 2008.

e. *Changes in the Development Plan*.   The Master Lease included a provision requiring the Lessor to submit for approval to the BIA the plans and specifications, and any substantial changes in the plans or specifications, for the development of the property.  Ct. Rec. 90 at 34. It did not require BIA approval of documents to develop relationships with tenants of the RV park.

f. *Subleases*.  Paragraph 8 of the Master Lease states:

8.    STATUS OF SUBLEASES ON CONCLUSION OF LEASE
Termination of thie [sic] Lease, by cancellation or otherwise, shall not serve to cancel subleases or subtenancies, but shall operate as an assignment to Lessor of any and all such subleases or subtenancies and shall continue to honor those obligations of Lessee under the terms of any sublease agreement that do no [sic] require any new or additional performance not already provided or previously performed by Lessee.  Beginning on January 15, 1984, and annually thereafter on each following January 15, Lessee shall send to Lessor a list of all sublessees together with their addresses.

Ct. Rec. 90 at 32.

A sublease through which the Mill Bay camping resort was created was entered into on June 11, 1984, between Evans and his company Mar-Lu, Ltd. Ct. Rec. 73 [Defs' SOF] at 33 [Ex. 2], *also* Ct. Rec. 90, Ex. 3.  The term of the sublease states it "shall expire on the date of the expiration of the Master Lease and exercised extension option, if any, whichever be

MEMORANDUM OPINION - 6

the later." *Id*. at 34.  Evans then began selling memberships through Mar-Lu Ltd.  Evans later dissolved Mar-Lu and continued selling memberships through Chief Evans, Inc.

g. *Purported Renewal.* In 1985, Evans purported to exercise the option to renew the Master Lease by a letter dated January 30, 1985, which Evans sent to the Colville Agency signed by Evans as "General Partner, Mar-Lu, Ltd."  The letter referenced the Master Lease and stated:

> In accordance with paragraph three (3) of the subject lease dated February 2, 1984, you are notified by receipt of this letter that Mar-Lu, Ltd hereby exercises its option to renew the subject lease for further term of twenty five (25) years to be effective at the expiration of the original twenty five (25) year term. This notice extends the total term of subject lease to February 1, 2034.

Ct. Rec. 90, Ex. 27 at 227.  The renewal clause, however, required that notice be given to the "Lessor and the Secretary."  The renewal clause did not require the Lessor or BIA to confirm receipt of the renewal notice.  There is no evidence in the record of any written response by the Colville Agency to Evans' renewal letter.   There is also no evidence in the record that the Colville Agency, in its role as fiduciary, forwarded any notice of the BIA's receipt of Evans' letter to the landowners.  It can not be determined from the record when, if ever, the MA-8 landowners became aware of Evans' purported renewal of the master lease. There is no evidence that anyone, from the time of Evans' 1985 letter until the year 2007, questioned whether Evans had validly exercised the renewal of the Master Lease.

The written record reflects that during the course of over twenty years, Evans and his successors after his death, the BIA, and some of the Indian landowners proceeded, without questioning, upon an assumption that the term of the Master Lease would be and had been validly extended an additional 25 years to the year 2034.  For example, in 1996, the BIA sent letters to certain MA-8 landowners stating "the term of this lease is to expire February 1, 2034."  Ct. Rec. 90, Ex. 35.  In 2004, the BIA listed itself as the "landlord" in a document provided to the Washington state liquor control board and also stated that the lease expired in 2034.  Ct. Rec. 90, Ex. 69 at 403.  As further described herein, business transactions and the development of MA-8 proceeded based upon these assumptions.

MEMORANDUM OPINION - 7

h. *Modification of the Development Plan - RV Park Expanded Memberships.* In 1989, Evans sought to modify his development plan to add a golf course and to change the RV Park to introduce "expanded camping memberships" so that campers could pay for a more exclusive right to a specific RV site on MA-8. As required by the terms of the Master Lease, he sought the BIA's approval for this change in development plan. Evans provided a copy of the "Expanded Membership Sale Agreement" to the BIA, the same document provided to those individuals who wished to purchase a membership. Ct. Rec. 90, Ex. 30-32. The Expanded Membership Agreement's provision on the duration of the agreement stated: *"The duration of this membership is coextensive with the fifty (50) year term commencing February 2, 1984, of Seller's lease for the Mill Bay property."* The BIA agreed to Evans' proposed change in the development plan by letter dated July 7, 1989. Its approval letter stated, "The modification in accordance with 'Expanded Membership Sale Agreement' has been reviewed by the Superintendent, and permission will be granted to incorporate into the lease." In its approval of the modification of the Master Lease, the BIA made no mention of and did not question the Membership Agreement's characterization of the 2034 term of the Master Lease. Ct. Rec. 90 at 231-247, Exs. 30-33.

In 1991, Evans began selling the "expanded memberships" to Mill Bay Members and new buyers. Evans and his staff made recitals in writing and verbally, that the membership agreements were coextensive with what was believed to be the 50-year term of the master lease. Between 1984 and 1994, approximately 183 consumers purchased camp memberships paying anywhere from $5995 to $25,000 for the membership. Ct. Rec. 1 at 94.

i. *1993 CTEC Sublease for the Casino.* On August 6, 1993, Evans negotiated a sublease of MA-8 to the Colville Tribal Enterprises Corporation ("CTEC") for purpose of construction and operation of a casino on a portion of MA-8. Ct. Rec. 90, Ex. 4. The sublease references Evans' January 30, 1985 letter and states that the option to renew the Master Lease had been exercised by that letter. Although the BIA would fourteen years later take the position that

the option to renew the lease *had not* been properly exercised, the BIA approved the CTEC sublease on November 10, 1993 apparently without questioning the term of the Master Lease.

j. *RV Park Members Litigate with Wapato Heritage.*  A dispute over  Mill Bay members' right to occupy MA-8 began in 2001 when Evans informed the Mill Bay members that he was considering closing the RV park at the end of the 2001 season due to financial losses.  The Mill Bay Resort members believed they had purchased the right to occupy the resort until the year 2034.   The Mill Bay Resort Members began pursuing information from the BIA regarding Evan's threatened action. They filed Freedom of Information Act requests from the BIA for information pertaining to MA-8's Master Lease.  They also contacted the BIA by letter dated May 8, 2002 because it was their belief the BIA had approved the plans for the expanded membership agreements, which included terms lasting to 2034.   The letter requested the BIA to provide them an "official position" regarding the threatened action by Evans.  Ct. Rec. 89 at 53-54.   The BIA did not take a position because it took the narrow view that the major dispute was over the contractual rights obtained by the resort members in their membership agreements with Evans.  The inquiry apparently did not cause the BIA to review or question the purported renewal of the Master Lease. Ct. Rec. 90 at 475-76 (Ex. 85).

Litigation eventually ensued.  A lawsuit was filed in Colville Tribal court seeking to close the RV park.  Ct. Rec. 90 at 254; Ct. Rec. 91 at 4.  Evans died on September 11, 2003.  Prior to his death, Evans established "Wapato Heritage LLC" to manage his non-trust assets. When he died his leasehold interest as the *lessee* of MA-8 was acquired by Wapato Heritage LLC.[3]  In 2004, Plaintiffs herein, Paul Grondal and the Mill Bay Resort Members, filed suit in Chelan County court seeking damages against Wapato Heritage LLC. During the

_____

[3] Wapato Heritage LLC possesses a life estate in Evans' MA-8 allotment interest (approximately 23.8% of MA-8) with the remainder reverting to the Colville Confederated Tribes.

MEMORANDUM OPINION - 9

proceedings the approximately 180 Mill Bay Resort contract holders formed and incorporated the "Mill Bay Members Association."

The litigation between Wapato Heritage LLC and Mill Bay Members was ultimately resolved through mediation and a settlement agreement. Ct. Rec. 90, Ex. 2. The settlement agreement between Wapato Heritage LLC and the RV Park Members modified the camping membership agreements. The RV Park Members agreed to reduce the space of the RV Park and increase the rent (retroactive to January 1, 2004) paid to Wapato Heritage LLC to $25,000 a year, incrementally increasing in years thereafter up to $55,000 a year. Ct. Rec. 90, Ex. 2. A key issue involved in the mediation was the RV Park Members desire to remain on MA-8 through 2034. The settlement proposals and the final agreement explicitly recognized the Mill Bay Members "right to continued use of the Park until December 31, 2034," though it also recognized that this right was subject to the terms of "the Master Lease with the BIA." Ct. Rec. 90, Ex. 2 at 62. The settlement agreement provided that "...the Mill Bay Members have a right to use the property...pursuant to the Prior Documents and this Agreement through December 31, 2034, subject to the terms of this Agreement and the Prior Documents." Ct. Rec. 90, Ex. 2 at 63. The Master Lease is listed as one of the "Prior Documents." The agreement was approved by the state court on November 23, 2004. The BIA, Colville Tribes, and the CTEC received notice of the agreement. Ct. Rec. 90 at 458-61 [Ex. 78].

The BIA was informed throughout the litigation of its progress and repeatedly asked by counsel for Wapato Heritage LLC to formally intervene and to participate in the mediation, recognizing that the issues the parties were attempting to resolve involved trust property and implicated rights provided for in the Master Lease. Though the BIA did not formally intervene in the case, its agents were informed, attended hearings (Ct. Rec. 126 at 59 [Ex. 114]), and participated in the mediation which ultimately resolved the case. Ct. Rec. 89 at 8-9.

MEMORANDUM OPINION - 10

It is uncontested that over the course of the years, representations had been made to some landowners on various occasions and at meetings that the Master Lease did not expire until 2034. The individual MA-8 landowners were not in attendance at the mediation and were not parties to the 2004 settlement agreement. At the time of the settlement, Wapato Heritage LLC began negotiations to obtain consent of the landowners and authorization to obtain a "Replacement Lease" for MA-8 which would carry a 99-year term and allow the development of a 75 lot residential subdivision. After the settlement, the RV Park Members paid the rent to Wapato Heritage and in February and April, 2007, Wapato Heritage wrote checks dividing the rent payable to each individual landowner. Ct. Rec. 91. The BIA distributed the checks. A note authored by Wapato Heritage LLC was sent with the first round of checks to each landowner informed each landowner that the remaining half of their rent check would be mailed upon receipt of their vote upon the proposed 99 year lease/development of MA-8. *Id*. at 10; Ct. Rec. 90, Ex. 82-84. The BIA distributed the checks along with Wapato Heritage's note to the landowners. The effort to obtain a 99-year lease was still ongoing when litigation was commenced in this district in June 2008.

k. *BIA's Review of the Status of the Renewal of the Master Lease*

The BIA admits it did not examine or question the legal efficacy of the purported renewal of the Master Lease until late 2007. This despite being well-informed of the RV Park Members' 2004 state court litigation, mediation and settlement, and despite repeated direct inquiries to the agency the response to which should have involved a review the Master Lease and the renewal:

• In August 2004, the BIA was asked in a letter from Evans' daughter, Sandra Evans, whether "her father's extension of the master lease in 1987 has any effect on the renewal of the RV Park sublease." Ct. Rec. 90 at 423 [Ex. 75].

• At some point after the Master Lease was entered into, the Colville Confederated Tribes ["CCT"] acquired an ownership interest(s) in MA-8 (approximately 18% in October 2007). On January 21, 2005, reservation attorney, Rit Bellis, sent a letter to the BIA

MEMORANDUM OPINION - 11

requesting a meeting to discuss "options of cancelling the Master Lease and the option of taking over the management of MA-8 during the Interim Order." Ct. Rec. 90, Ex. 81.

• In October 2006, MA-8 landowner Marlene Marcellay specifically asked the BIA to answer the question: "When did the BIA approve the option to extend? Was the option to extend the lease until the year 2034 actually presented to and approved by 51% of the landholders?" Ct. Rec. 126 at 47 [Ex. 112]. According to her follow up letters to the BIA, by March 28, 2007, the BIA had failed to respond to her inquiry. Ct. Rec. 126 at 51 [Ex. 112].

One year after Marcellay's inquiry, in October 2007, allegedly after the Tribe sent a letter to the BIA requesting a meeting to discuss the status of the renewal of the Master Lease, the BIA then examined the issue of renewal. In a letter to Wapato Heritage LLC dated November 30, 2007, the BIA stated its position that the option to renew had not been effectively exercised by Evans' 1985 letter to the BIA because there was no evidence Evans had provided notice of his exercise of the option to renew to the landowners as required by the terms of the Master Lease. Ct. Rec. 90 ex. 93. In order to complete its review of the issue, the letter requested Wapato Heritage provide documentation if its records indicated otherwise. *Id*.

Although there was still two months left to effectuate a renewal under the terms of the Master Lease, Wapato Heritage's counsel, Michael Arch, responded to the BIA with a letter dated December 18, 2007, expressing disagreement with the position taken by the BIA, calling it "erroneous and frivolous," and threatening litigation. Ct. Rec. 90 at 654-55 [Ex. 94]. Arch's response did not mention that in December 2006, he had apparently copied "the Allottees" on a letter to the BIA with Bill Evans' 1985 renewal letter attached. Ct. Rec. 9.

On April 3, 2008 the Colville Confederated Tribe's Tribal Business Council passed a resolution expressly indicating its support of the BIA's position concerning the expiration of the Master Lease and expressing its interest in "seeking to be the new Master Lease holder upon expiration of the current Master Lease." Ct. Rec. 90, Ex. 93 at 648.

MEMORANDUM OPINION - 12

On June 9, 2008, Wapato Heritage filed its action in the U.S. District Court against the United States challenging the decision made by the BIA that the Master Lease was to expire on February 2, 2009. *Wapato Heritage LLC v. United States,* EDWA Cause No. 08-CV-177-RHW ("*Wapato Heritage* case"). Wapato Heritage LLC asserted three arguments: 1) that Evans had actually or substantially complied with the renewal notice terms of the Master Lease; 2) alternatively, regardless of Evans' actions, the BIA through its own actions had approved and extended the term of the lease; and 3) that equity favored a determination that the lease renewal was validly exercised. Both parties moved for summary judgment under the Administrative Procedures Act. On August 7, 2008, Acting BIA Superintendent informed Wapato Heritage that it believed the Master Lease would expire as of February 2, 2009. The agency's decision was administratively appealed and upheld in October, 2008.

On November 21, 2008, Judge Whaley issued a decision in the *Wapato Heritage* case rejecting all three of Wapato Heritage LLC's contentions and dismissing the claim for declaratory judgment that the option to renew was validly exercised. In denying the motion for reconsideration, Judge Whaley held:

> Moreover, the law and the Master Lease itself remain clear that the Bureau of Indian Affairs is not the lessor nor even a party to leases of this kind....Plaintiff's renewed argument that 'BIA was the sole Lessor under the Master Lease'...is inconsistent with the unambiguous language of the lease and the law guiding the Court's interpretation of that instrument.

Cause No. 08-CV-177-RHW, Ct. Rec. 58 at 3.

After Judge Whaley's ruling, on December 10, 2008, the BIA informed the occupants of MA-8 that the Master Lease would expire as of February 2, 2009 and that their right to use and occupy the resort property would also expire at that time, unless further action was taken. The BIA informed them they should negotiate new leases with the Indian landowners if they wished to continue to occupy the property. Ct. Rec. 90, Ex. 101. On January 21, 2009, the action before this court was filed by the RV Park Member's Association and its individual member Paul Grondal. The "Claims for Relief" asserted by Plaintiffs in the Complaint are as follows:

Claim No. 1: "Estoppel." This claim generally alleges the BIA was authorized to bind the allottees to the Master Lease and any modifications and BIA should be prohibited from repudiating 20 years of statements and actions signifying the term of the lease extended until 2034.

Claim No. 2. "Waiver and Acquiescence." This claim generally alleges the BIA has waived any objections to the validity of the notice to exercise the option to renew the Master Lease by its conduct approving and failing to object to the Extended Membership Agreements and the Settlement Agreement, and by accepting increased rent payments as scheduled under the Settlement Agreement.

Claim No. 3: "Modification." This claim generally alleges the BIA had the authority to and did approve the Membership Agreements which extended the term of the Association's tenancy to 2034.

Claim No. 4: "Agency Action was Arbitrary, Capricious, an Abuse of Discretion, and Not In Accordance with Law." This claim generally alleges the "BIA's position" that it did not have authority to accept notice on behalf of MA-8 allottees, to modify the terms of the master lease or its subleases, is an abuse of discretion, which has caused injury to Plaintiffs.

Claim No. 5: "Violation of the Fifth Amendment to the Constitution of the United States." This claim generally alleges the BIA's determination that the tenancy of MA-8 expired on February 2, 2009 deprived Plaintiffs of their property rights without due process of law.

Finally, Plaintiffs' sixth claim asserts a claim for declaratory judgment.

### III.    STANDARD OF REVIEW

The United States has moved to dismiss Plaintiffs' Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6). Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks proper subject matter jurisdiction. The court may determine jurisdiction on a motion to dismiss for lack of jurisdiction under Rule 12(b)(1) so long as "the jurisdictional issue is [not]

MEMORANDUM OPINION - 14

inextricable from the merits of a case." *Kingman Reef Atoll Invs., L.L.C. v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008).

Rule 12(b)(6) permits a motion to dismiss a claim for "failure to state a claim upon which relief can be granted[.]" A Rule 12(b)(6) motion will be denied unless it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1132 (9th Cir. 2002) (citing *Swierkiewicz v.. Sorema N.A.*, 534 U.S. 506 (2002)). The court takes all material allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th Cir. 1986).

Rule 12(b)(6) does not allow a court to reach "matters outside the pleading" without following the summary judgment procedures of Rule 56. Fed.R.Civ.P. 12(b); *San Pedro Hotel Co., Inc. v. City of Los Angeles*, 159 F.3d 470, 477 (9th Cir. 1998) ("If matters outside the pleadings are considered, the motion to dismiss is to be treated as one for summary judgment."). Here, the parties have filed declarations and exhibits in support of their briefs. Both parties have had an opportunity to present all material made pertinent to this motion. See Fed.R.Civ.P. 12(b). The court will therefore treat this matter as a motion for summary judgment and apply the general standard of review for summary judgment. *See San Pedro Hotel*, 159 F.3d at 477.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion...." *Id.* at 323. The non-moving party "may not reply merely on allegations or denials in its own pleading; rather, its response

must-by affidavits or as otherwise provided in this rule-set out specific facts showing a genuine issue for trial." Fed.R.Civ.P. 56(e).

When evaluating a motion for summary judgment, the court views the evidence through the prism of the evidentiary standard of proof that would pertain at trial. *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court draws all reasonable inferences in favor of the nonmoving party, including questions of credibility and of the weight that particular evidence is accorded. *See, e.g., Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1992). The court determines whether the non-moving party's "specific facts," coupled with disputed background or contextual facts, are such that a reasonable jury might return a verdict for the non-moving party. *T.W. Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). In such a case, summary judgment is inappropriate. *Anderson*, 477 U.S. at 248. However, where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Summary judgment is not warranted if a material issue of fact exists for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 516 U.S. 1171 (1996). The underlying facts are viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "Summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970). However, once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an issue of fact regarding an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party

MEMORANDUM OPINION - 16

1  cannot rely on its pleadings, but instead must have evidence showing that there is a genuine
2  issue for trial. *Id.* at 324.

3  **IV.     DISCUSSION**

4  **A.  Jurisdiction over Plaintiffs' Complaint**

5      The Federal Defendants move to dismiss Plaintiffs' Complaint for lack of subject matter
6  jurisdiction pursuant to Rule 12(b)(1), or alternatively Rule 12(b)(6).     Because the
7  jurisdiction of federal courts is limited the party invoking federal jurisdiction bears the
8  burden of proof.

9      **1.     Plaintiffs' Claims 4 and 5; Court Lacks Jurisdiction under the APA**

10      "It is axiomatic that the United States may not be sued without its consent and that the
11  existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S.
12  206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Such consent may not be implied, but must
13  be "unequivocally expressed." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33-34, 112
14  S.Ct. 1011, 117 L.Ed.2d 181 (1992).  Absent a waiver of sovereign immunity, the court lacks
15  subject matter jurisdiction.  Plaintiffs' Complaint asserts that the United States has waived
16  sovereign immunity pursuant to the Administrative Procedure Act and the Fifth Amendment.
17  Ct. Rec. 1 at ¶ 26. The APA contains an explicit waiver of the sovereign immunity of the
18  United States to be sued.  5 U.S.C.  § 702 (2006). However, this waiver permits suit by
19  parties "suffering legal wrong because of agency action," *id.*, which is elsewhere limited by
20  Congress to mean only "final agency action." *Id.* § 704 (emphasis added).

21      Plaintiffs Fourth and Fifth claims for relief, as well as their Fourth motion for summary
22  judgment claim that under the Administrative Procedures Act BIA action was arbitrary,
23  capricious and not in accordance with the law.  Though it is not clear from the Complaint
24  what agency action the Plaintiff seeks review of,[4] Plaintiffs' motion refers to the BIA's

25  ────────────

26      [4]  The agency action referred to in the Complaint was described as the BIA's "most
   recent decisions" and its "current position that it did not have authority to accept notice on
   MEMORANDUM OPINION - 17

1    December 2008 letters from the Regional Solicitor's Portland Office and the Superintendent
2    of the Colville Agency which set forth the BIA's position that the Plaintiffs' tenancy expired
3    when the Master Lease expired, on February 2, 2009. Plaintiffs' Fifth Claim for relief asserts
4    the BIA's failure to provide Plaintiffs opportunity to be heard before rendering the 2008
5    decision violated their procedural due process rights. The Federal Defendants argue that its
6    December 2008 was not "final agency action" and was "no more than a courtesy gesture"
7    responding to the Plaintiffs' inquiry following the decision in the *Wapato Heritage* case. Ct.
8    Rec. 121 at 3.

9        Agency action is considered "final" when: (1) the action marks "the 'consummation' of
10   the agency's decisionmaking process;" and (2) the action is one by which " 'rights or
11   obligations have been determined,' or from which 'legal consequences will flow.' " *Bennett*
12   *v. Spear*, 520 U.S. 154, 177-78, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997) (citations
13   omitted). Helpful in understanding the second *Bennett* prong is the Ninth Circuit's decision
14   in *Fairbanks North Star Borough v. U.S. Army Corps of Engineers*, 543 F.3d 586 (9th Cir.
15   2008). In that case, the Army Corps had issued a jurisdictional determination finding that the
16   Plaintiffs' property contained wetlands subject to Clean Water Act regulatory provisions
17   forbidding any discharge of dredged or fill materials without securing a permit. The court
18   reasoned that this action was not a final agency action under the APA under the second prong
19   of *Bennett* because as the Plaintiffs' "rights and obligations remain unchanged" by the
20   determination and the decision did not "itself command [Plaintiff] to do or forbear from
21   anything..." *Id*. at 594.

22       [A]s a bare statement of the agency's opinion, it can be neither the subject of 'immediate
23       compliance' nor of defiance. Up to the present, the Corps has 'expresse[d] its view of
         what the law requires' of Fairbanks without altering or otherwise fixing its legal

24   _____

25   behalf of the Allottees, modify the terms of the Master Lease, modify terms of any Subleases
26   to MA-8, or otherwise burden and encumber the allottees' rights to MA-8." Ct. Rec. 1 at §
     197.

     MEMORANDUM OPINION - 18

relationship. This expression of views lacks the 'status of law or comparable legal force.' In any later enforcement action, Fairbanks would face liability only for noncompliance with the CWA's underlying statutory commands, not for disagreement with the Corps' jurisdictional determination.

*Id.* (citations omitted).

Nowhere in the statutory scheme of the leasing of Indian lands is there granted to the Secretary the discretion to declare an approved lease expired and thereby declare a contract extinguished. Such a function is judicial in scope and is not entrusted to the Secretary, but rather reserved for court action, either seeking declaratory relief to determine the respective rights and obligations of the parties to the lease, or a suit by the lessor (or the United States on their behalf) to recover possession of the leased premises. The 2008 letters of the BIA did not "impose an obligation, deny a right, or fix some legal relationship" – they were <u>not</u> binding determinations. If they were, it would make the BIA, who is obligated to act on behalf of just the lessors, the final arbiter of the respective rights and obligations of the parties to the lease contract. Such governmental authority would be an anathema to the basic notion of due process. Moreover, the statute states "preliminary, procedural, or intermediate agency action," as distinguished from final agency action, is "not directly reviewable" under the APA, although it "is subject to review on the review of the final agency action." 5 U.S.C. 704.

There is nothing for the court to review under the Administrative Procedures Act as there has been no final agency action, and therefore there are no facts which will support judicial review of Plaintiffs' Fourth Claim for Relief under the APA. Likewise, the lack of final agency action leaves no basis for reviewing Plaintiffs' due process claim asserted in their Fifth Claim for Relief because neither the federal question statute, the Declaratory Judgment Act, or the Constitution contain waivers of sovereign immunity. Accordingly, Plaintiffs' Fourth and Fifth Claims for Relief asserted in the Complaint are dismissed for lack of subject matter jurisdiction and the court also dismisses the request for declaratory judgment "holding

MEMORANDUM OPINION - 19

unlawful and setting aside the Defendants' determinations that the Master Lease was not properly renewed..." Ct. Rec. 1 at 44, ¶ 6.

**2. Plaintiffs' Claims 1-3 and 6**

Plaintiffs' first three causes of action (in conjunction with its Sixth cause of action) seek declaratory relief based upon the equitable defenses estoppel, waiver, acquiescence and modification. They are each directed at the BIA. Plaintiffs' first three claims for relief are subject to dismissal for a variety of reasons. The United States has moved to dismiss these causes of action on the grounds that they fail to state a claim, but it nonetheless recognizes that they raise equitable/anticipatory affirmative defenses to its ejectment action. Plaintiffs' First claim seeks to estop the BIA from repudiating it actions and statements of the last 20 years that the Master Lease had been renewed and expired in 2034. The Second claim contends BIA conduct waived objection to the renewal of the Master Lease. The Third claim alleges BIA conduct modified the term of Master Lease by granting approval of the Membership Agreement.

First, while it is well settled that 28 U.S.C. § 1331 is a jurisdictional statute, it is not a waiver of the United States' sovereign immunity. *Army and Air Force Exchange Service v. Sheehan*, 456 U.S. 728, 102 S.Ct. 2118 (1982). A waiver of sovereign immunity must come from the statute giving rise to the cause of action. The Declaratory Judgment Act, 28 U.S.C. § 2201, does not constitute a waiver of sovereign immunity. *Schilling v. Rogers*, 363 U.S. 666, 677, 80 S.Ct. 1288, 1296 (1960). There being no cognizable claim asserted under the Administrative Procedure Act, the court does not have subject matter jurisdiction over any such claim asserted against the BIA. The court does, however, have jurisdiction over the United States' trespass action brought on behalf of the Indian allottees. However, the court's adverse ruling on Plaintiffs' cause of action for declaratory relief against the BIA, does not restrict or limit the defenses the Plaintiffs can assert to the trespass claim brought by the United States.

MEMORANDUM OPINION - 20

Second, a private party can hardly estop the Government from taking a certain position on an issue. Moreover, it would be unnecessary to estop the Government from taking a position because the Government is not the lessor, not a party to the Master Lease, and does not possess the authority to decide contract disputes. The BIA's own view of whether the Master Lease had expired is meaningless to the actual judicial determination of whether this is in fact the case. The BIA's position on the renewal served only to provide notice to the lessee that an issue existed and also of the potential for an enforcement action by the United States on behalf of the Indian landowners.

Thirdly, even if subject matter jurisdiction existed, dismissal of Plaintiffs' first three causes of action and claim for declaratory relief against the BIA would be appropriate, as they raise the identical claims made and issues raised by Wapato Heritage against the BIA, and rejected in the case before Judge Whaley. There are three narrow issues pertaining to the Master Lease which were fully litigated before Judge Whaley. Issue preclusion bars relitigation of these findings here:

1)   The BIA is not a party to the Master Lease;
2)   Evans and Wapato Heritage (the lessees to the Master Lease) did not actually or substantially comply with the notice requirements of the renewal provisions of the Master Lease; and
3)   The BIA had no authority to unilaterally modify the terms of the Master Lease or ratify any deficiency in compliance with the terms of the lease.

See EDWA Cause No. 08-CV-177, Ct. Rec. 30. These findings are on issues identical to Plaintiffs' assertions in the Complaint herein that "the option to renew the Master Lease has been validly exercised" (Ct. Rec. 1, ¶ 212) and "the BIA had actual authority to sign on behalf of the Allottees and subsequently modify the terms of the lease" (Ct. Rec. 1, ¶ 213).

"The general principle … is that a right, question or fact distinctly put in issue and directly determined … cannot be disputed in a subsequent suit …." *Southern Pac. R. R. v. U. S.*, 168 U.S. 1 (1897). Issue preclusion bars re-litigation of issues adjudicated and essential to the final judgment of earlier litigation between the parties. *Dodd v. Hood River County*, 136 F.3d 1219, 1224-1225 (9th Cir. 1999); *Garrett v. City and County of San Francisco*, 818

F.2d 1515, 1520 (9th Cir. 1987). The purpose behind both issue preclusion and claim preclusion is to prevent multiple lawsuits and to enable parties to rely on the finality of adjudications. *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980).

Under Ninth Circuit law, an adjudication in a prior action serves as a bar to litigation of a claim if the prior adjudication (1) involved the same claim/issue as the later suit; (2) reached a final judgment on the merits, and (3) involved the same parties or their privies. *Id.*; *see also Blonder-Tongue Labs. v. University of Ill. Found.*, 402 U.S. 313, 323-24, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). The court finds that as to the three limited issues identified above, all three elements are met. Though Plaintiffs were not a party to Judge Whaley's case, they are bound by Judge Whaley's narrow ruling because as to the issues decided, Plaintiffs interests are aligned entirely with Wapato Heritage by virtue of their relationship via the membership agreements. *See Taylor v. Sturgell,* 128 S.Ct. 2161, 2173 (2008) (permitting non-party preclusion based on based on pre-existing substantive legal relationships and also when the non-party was adequately represented by someone with the same interests who was a party in the prior lawsuit). Plaintiffs do not claim they have been granted any right to exercise the option to renew in the master lease. In fact, in this case there is no, nor has there been, any contention of a contractual tie or privity of contract between the Plaintiffs and the original lessor, the MA-8 allottees. Plaintiffs admit their Membership Agreements give them rights only from Wapato Heritage, whose rights, in turn, flow from the Master Lease. Thus, *as to the Master Lease itself*, Plaintiffs would have no greater rights or interests, than Wapato Heritage. Accordingly, as to questions regarding the terms and interpretation of the Master Lease, Plaintiffs and Wapato Heritage have mutual interests, thus fairly affording application of preclusion as to the limited issues Judge Whaley ruled upon.

The court rejects the Federal Defendants' attempt to more broadly characterize Judge Whaley's ruling as precluding Plaintiffs from making <u>any</u> argument regarding the term of the Master Lease in this lawsuit. The Federal Defendants assert that any argument as to whether the Master Lease was or should be extended to 2034 should be dismissed on the grounds of

MEMORANDUM OPINION - 22

issue and claim preclusion because of Judge Whaley's decision in the *Wapato Heritage* case. However, estoppel applies only to preclude relitigation of issues actually decided in the proceeding. Judge Whaley's decision did not declare the expiration date of the Master Lease and more relevantly, did not address Plaintiffs rights to occupy MA-8. Notably, the landowners, the Master Lease lessors, were not even named parties to that lawsuit. Rather, upon Wapato Heritage's own submission of the issue to the court, Judge Whaley only ruled that Evans had not actually or substantially complied with the notice requirement of the renewal provision. Judge Whaley's decision forecloses re-litigation only of the three precise issues addressed by the ruling and identified above.

Though the court recognizes that grounds for appeal of Judge Whaley's decision may exist, the established rule in federal courts is that a final judgment retains all of its res judicata consequences pending decision of any appeal. *Tripati v. Henman*, 857 F.2d 1366, 1367 (9th Cir. 1988). "[The] doctrine of res judicata is not a mere matter of practice or procedure .... It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts ...." *Hart Steel Co. v. Railroad Supply* Co., 244 U.S. 294, 299, 37 S.Ct. 506, 507, 61 L.Ed. 1148. Pp. 2427-2430.

The foregoing discussion requires the court to consider the related question of whether Plaintiffs have standing to seek declaratory relief against the MA-8 landowners as to the expiration of the Master Lease. The court has considered the general rule that a party does not possess standing to bring a declaratory judgment claim regarding rights and obligations under a contract to which it is neither a party nor a third-party beneficiary. *See Mardian Equip. Co. v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 2456214, at *5-6 (D.Ariz. 2006)(not reported)(plaintiff lacked standing to bring declaratory judgment claim against insurer concerning the meaning of a policy to which it was not a party or third party beneficiary); *cf. Newcal Indus., Inc. v. IKON Office Solution,* 513 F.3d 1038, 1055 (9th Cir. 2008) cert. denied --- U.S. ----, 129 S.Ct. 2788, 174 L.Ed.2d 290 (2009)(privity of contract was not necessary

1  because the threat of suit was enough to create standing since a threatened party may seek a

2  declaration that the threatening party's putative rights are invalid).  However, under *Newcal*,

3  the court finds that the Government's threat of ejectment is sufficient to confer standing  on

4  Plaintiffs to seek declaratory relief against the MA-8 landowners regarding Plaintiffs'

5  entitlement to occupy MA-8.  Importantly, since Wapato Heritage is a named Defendant, to

6  the extent the declaratory relief sought would purport to bind Wapato Heritage, certainly

7  Wapato Heritage could assert itself on the issues raised.  Finally, declaratory relief in this

8  circumstance could "serve a useful purpose in clarifying and settling the legal relations in

9  issue" and could "terminate the proceedings and afford relief from the uncertainty and

10  controversy faced by the parties."  *United States v. Washington*, 759 F.2d 1353, 1357 (9th

11  Cir. 1985).

12       **3. Conclusion**

13       The court lacks subject matter jurisdiction over Plaintiffs' five claims and requests for

14  declaratory relief against the United States Bureau of Indian Affairs.   As explained below,

15  the court does possess subject matter jurisdiction over the United States' trespass action and

16  construes Plaintiffs' Complaint and Answer to the Government's ejectment counterclaim (Ct.

17  Rec. 43) as a claim for declaratory relief against the MA-8 landowners, on whose behalf the

18  United States has not entered an appearance.

19  **B.  United States' Trespass Claim**

20       This court has jurisdiction over the United States' counterclaim for trespass and ejectment

21  under 28 U.S.C. § 1345 which provides, "[e]xcept as otherwise provided by Act of Congress,

22  the district courts shall have original jurisdiction of all civil actions, suits or proceedings

23  commenced by the United States, or by any agency or officer thereof expressly authorized

24  to sue by Act of Congress." 28 U.S.C. § 1345.

25       The Federal Defendants' Motion for Summary Judgment seeks the court's decision on

26  its counterclaim for trespass and request for an ejectment order against the Plaintiffs.

**1. Trespass Action May be Premature**

Judge Whaley has determined that the BIA was not a party to the Master Lease. Accordingly, the BIA has no independent *contractual* right to enforce the terms of the Master Lease. The authority of the BIA in regards to the Master Lease stems entirely from federal regulatory law. Government agencies are required to scrupulously abide by their own regulations and existing statutes.

The Government holds the allotment in trust for allottees and has the power to control occupancy on the property and to protect it from trespass. *See United States v. West*, 232 F.2d 694, 698 (9th Cir .1956); see also 25 C.F.R. § 162.106(a); 73B C.J.S. Public Lands § 5. 25 C.F.R. § 162.108 is entitled "What are BIA's responsibilities in administering and enforcing leases?" It states in relevant part:

> (b) We will ensure that tenants comply with the operating requirements in their leases, through appropriate inspections and enforcement actions <u>as needed to protect the interests of the Indian landowners and respond to concerns expressed by them</u>. We will take immediate action to recover possession from trespassers operating without a lease, and take other emergency action as needed to preserve the value of the land.

25 C.F.R. 162.108 (emphasis added). 25 C.F.R. §162.623 deals specifically with holdover tenants in non-agricultural leases and is entitled "What will BIA do if a tenant holds over after the expiration or cancellation of a lease?" It provides:

> If a tenant remains in possession after the expiration or cancellation of a lease, we will treat the unauthorized use as a trespass. Unless we have reason to believe that the tenant is engaged in negotiations with the Indian landowners to obtain a new lease, we will take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law.

25 C.F.R. §162.623. The regulations also indicate that in the event a tenant does not cure a lease violation within the requisite time period, the BIA must, under 25 C.F.R. § 162.619, "consult with the Indian landowners, as appropriate," and determine what remedies should be invoked, including for example whether to provide the tenant with additional time to cure. The regulations make clear that the entire purpose of the authority and remedies provided to the BIA for lease violations is to ensure that the landowners' property and financial interests are protected.

MEMORANDUM OPINION - 25

There is no evidence in this case that the BIA has consulted with the Indian landowners or that this trespass action is a response to their concerns. In addition, the record in this and Judge Whaley's case establishes that the BIA should "have reason to believe" that the tenant, Wapato Heritage, was and is engaged in efforts to obtain a new lease. The record herein evidences that Wapato Heritage has been attempting to negotiate a 99-year lease with the Indian landowners since at least 2004 and that a proposed lease has been before the BIA since 2006. Major issues concerning majority landowner consent and compliance with NEPA delayed Wapato Heritage's efforts to secure the lease and to obtain BIA approval. In December 2007, the BIA made two decisions which raised additional issues for Wapato Heritage. First, it determined that a full environmental impact statement would be required for its approval of the 99-year lease proposal, a decision contrary to the conclusion reached by the contractor hired by Wapato Heritage that the project would have no significant impact. Second, it decided that it did not believe the Master Lease had been renewed and that it would expire in 2009. These issues remaining unresolved, Wapato Heritage then filed its action against the BIA asserting a claim that the BIA had refused to timely consider the 99-year lease proposal. On November 6, 2009, Judge Whaley ruled that claim was subject to dismissal for failure to exhaust administrative remedies and alternatively, because there was "no unreasonable delay in the BIA's two year review of the lease that would bind the beneficial owners of MA-8 for a period of 99 years." Ct. Rec. 82.

As recently as August 6, 2009, in the BIA's reply brief filed in the *Wapato Heritage* case, the BIA admits there exists a "99 year commercial lease proposal," and that there has been "no final agency action on the proposed lease..." Ct. Rec. 81 at 3. The BIA took the position therein that the BIA had "timely began its review of the proposed [99 year] lease" also that "the proposed lease would have replaced the former lease." *Id*. at 5. The BIA also asserted in a footnote, its opinion that Wapato Heritage had chosen to "abandon its efforts for BIA approval of the lease" and instead decided to pursue legal action.

MEMORANDUM OPINION - 26

Wapato Heritage's decision to file suit in an attempt to avoid further delay in the lease review process is not evidence that it has "abandoned" its efforts to obtain a 99 year lease. Indeed, in the courts' view, the lawsuit suggests just the opposite –that Wapato Heritage strongly desires the approval of its proposed lease and reasonably, desires the process for approval to be conducted without delays.   Despite this fact and the BIA's recognition that it has issued no final decision on the 99 year lease proposal, the BIA proceeded to file its trespass counterclaim. This action suggests to the court that the BIA is in fact rejecting or will refuse to further entertain the 99 year lease proposal.  If the fact were otherwise, it would not have so hastily elected to pursue the most drastic remedy available of seeking to displace people from their current occupancy of the property.   If this is the BIA's position, then Wapato Heritage is entitled to have the BIA render a final decision so that it may pursue any administrative or legal remedies available to it in regards to the 99-year lease.

If efforts to obtain approval on the 99 year lease are actually ongoing, or the BIA has yet to consult with the Indian landowners in regards to the issue of Evans' failure to properly renew under the Master Lease, then the BIA's trespass action is inappropriate.  Premature adjudication of the United States' trespass action is especially inappropriate in the circumstances of this case, where it seeks to displace Plaintiffs from their residence on the property.   The ejectment remedy sought could be all be for nothing, *if* the 99 year lease proposal is granted or if appellate review should result in a different outcome in Judge Whaley's case.

Accordingly, at this time, the Federal Defendants' Motion for Summary Judgment is **DENIED,** with leave to renew.  If the Federal Defendants' opt to renew their motion, they must supplement their motion with evidence that federal regulations governing their conduct in this action have been complied with and that the action is not premature.

**C.  Plaintiffs' Summary Judgment Motions and Defenses to the Trespass Action**

Though it appears as though the United States' trespass action may be premature, in order to assist the parties in clarifying and settling the relations in issue and also to "afford relief

from the uncertainty and controversy faced by the parties," the court proceeds herein to address some of the arguments raised in Plaintiffs' four summary judgment motions. These motions raise defenses against the claim they are trespassers. In order to succeed on its trespass action, the United States would have to demonstrate the Plaintiffs were unlawfully withholding possession of the property. The United States' position is that Plaintiffs' right to occupy MA-8 ceased when the Master Lease expired, which it asserts was February 2, 2009. Plaintiffs dispute these positions and have filed four summary judgment motions seeking declaratory relief to the contrary. Plaintiffs' first summary judgment motion argues the terms of the Master Lease, the Expanded Membership Agreement, and the 2004 Settlement Agreement entitle them to remain on the trust property through February 2034. Plaintiffs' second motion specifically seeks an order declaring that the Settlement Agreement entitles them to such occupancy. Plaintiffs' third and fifth motions for summary judgment seek equitable rulings that the Defendants are estopped from denying the Plaintiffs' rights to occupancy until 2034.

**1.    Paragraph 8 of the Master Lease Does Not Provide Legal Right for Plaintiffs to Occupy Mill Bay Resort until 2034**

Plaintiffs' argue that the Federal Defendants' position that Plaintiffs' tenancy expired with the expiration of the Master Lease is not supported by the terms of the Master Lease itself. Paragraph 8 of the Master Lease provides:

8.    <u>STATUS OF SUBLEASES ON CONCLUSION OF LEASE</u>

Termination of thie [sic] Lease, by cancellation or otherwise, shall not serve to cancel subleases or subtenancies, but shall operate as an assignment to Lessor of any and all such subleases or subtenancies and shall continue to honor those obligations of Lessee under the terms of any sublease agreement that do no [sic] require any new or additional performance not already provided or previously performed by Lessee. Beginning on January 15, 1984, and annually thereafter on each following January 15, Lessee shall send to Lessor a list of all sublessees together with their addresses.

Ct. Rec. 90 at 32.

The Master Lease also allowed the Lessee to sublease "all, part or portions of the lease premises for lawful purposes upon written approval of the Secretary of the Interior or his

MEMORANDUM OPINION - 28

authorized representative, which approval or rejection must be in writing within thirty (30) days of written application therefore or approve will be conclusively presumed." Ct. Rec. 90, Ex. 1 at ¶ . Plaintiffs argue that their occupancy of MA-8 falls into Paragraph 8 of the Master Lease.  Plaintiffs identify the alleged "sublease" as their Expanded Membership Agreement and the 2004 Settlement Agreement.   Moreover, Plaintiffs contend Paragraph 8 applies both in the instance when the Master Lease terminates or naturally expires on its own terms.

a. **Plaintiffs' Occupancy is not a Subtenancy**

Paragraph 8 does not apply to Plaintiffs because neither their Membership Agreements or the Settlement Agreement created a subtenancy.  Plaintiffs were mere licensees, not tenants, as their right was to use the premises, not a right to possession.  Neither the Expanded Membership Agreements nor the 2004 Settlement Agreement have specific indicia of leases.  Whether an instrument is a lease (or a license) depends on the intention of the parties.  First, neither agreement is denominated as a lease or generally follow the form of a lease.  This is contrary to the terms of the Mar-LU and CTEC agreements which were identified as subleases. Ct. Rec. 90 at 104-110, 112-132 [Ex. 3 and 6].  Neither agreement refers to Plaintiffs as "tenants" or of Wapato Heritage LLC as "landlord."  The Expanded Membership Agreement refers to "Seller" and "Purchaser."  The payment for the rights was originally in the form of "dues" rather than rent.  However, the court does recognize that the Settlement Agreement did provide for increased "rent" for the Members' "continued *use* of the Park." Ct. Rec. 90 at 60-61.

Second, a key characteristic that typically distinguishes between a tenancy from a mere license is the right to exclusive possession or a right to an interest in land.  AMJUR LANDLORD § 20; *Spinks v. Equity Residential Briarwood Apartments,* 171 Cal.App.4th 1004, 90 Cal.Rptr.3d 453 (Cal.App. 6 Dist. 2009)(applying California law).  Here, the Plaintiffs' right was only to *use* the premises, which is typical of a license, not a lease.  The Expanded Membership Agreement states:

MEMORANDUM OPINION - 29

"This membership constitutes only a contractual license to use such facilities as may be provided by Seller from time to time.  Such facilities are subject to change and this membership therefore has no application to, does not constitute an interest in, is not secured by, and does not entitle the Purchaser to any recourse against any particular real property or facilities...The duration of this membership is coextensive with the fifty (50) year term...of Seller's lease for the Mill Bay property..."

Ct. Rec. 90 at 237.  The Settlement Agreement states:

5.14 Nature of Interest
All parties acknowledge that the Mill Bay Members have a right to use the property commonly known as the Park pursuant to the Prior Documents and this agreement, through December 31, 2034, subject to the terms of this agreement and the Prior Documents.  The Mill Bay Members agree and acknowledge they do not have the right to sell or encumber the underlying fee interest in the Park."

Ct. Rec. 90 at 634.  Even the Operator's Public Offering Statement for Registration of Camp Resort Contracts states in part that, "Each purchaser's membership agreement affords a license *to use* all camping club property and facilities....No title to or leasehold interest in the project's property is conveyed to club members." Ct. Rec. 85 at 85 [Grondal Decl.](emphasis added).

Neither the Expanded Membership Agreement nor the Settlement Agreement have characteristics of a contract creating a tenancy.  There is no evidence in the record suggesting Paragraph 8 of the Master Lease was intended to apply to mere licensees.

**b. Paragraph 8 Does Not Apply to the Natural Expiration of the Lease**

In addition, assuming for purposes of analysis that a subtenancy was created or Paragraph 8 was intended to apply to license agreements, Paragraph 8 of the Master Lease applies only to unexpected terminating events such as cancellation, as opposed to terminating events such as the normal expiration.  Paragraph 8 states that termination of the lease by " by cancellation or otherwise" will not serve to end subtenancies.  Plaintiffs contend Paragraph 8's phrase "termination, by cancellation or otherwise" should be interpreted identically to the language at ¶ 30 on the delivery of possession of the premises upon "termination of this lease, by normal expiration or otherwise."  However, as the Federal Defendants argue, interpreting the contract to permit the continuation of subleases beyond the natural expiration of the lease would conflict with the terms of ¶ 7 entitled "Subleasing" which states "No part of the

MEMORANDUM OPINION - 30

premises shall be subleased for a period extending beyond the life of this Lease and that all subleasings shall be made expressly subject to the terms of this Lease...” It is logical that in the event the lease would terminate unexpectedly, Paragraph 8 would protect those subtenants who had contracted based upon the normal expiration of the lease. Because the Master Lease precludes subletting for a term beyond that of the natural expiration of the lease, it does not make sense to interpret Paragraph 8 to permit that to occur. Moreover, the language of ¶ 30 cited by Plaintiffs, supports the Federal Defendants' view that the drafters of the lease intended ¶ 8 to refer to unexpected terminating events such as cancellation, as opposed to terminating events such as the normal expiration.

**2. 2004 Settlement Agreement**

**a.      Settlement Agreement Did not Modify the Master Lease**

Plaintiffs contend in their First and Second motions for Summary Judgment that the 2004 Settlement Agreement between Wapato Heritage LLC and Plaintiffs operated to “modify” the Master Lease because the settlement reduced the space of the RV Park, increased the rent, and “reaffirmed” the expiration date of the Master Lease of February 1, 2034. Plaintiffs make the argument that the Settlement Agreement is substituted in the place of the inconsistent terms of the Master Lease, and it is binding upon the “Allottees” because the Indian landowners “ratified it” by their acceptance of the benefits of the Settlement Agreement e.g., the “settlement money” (in the form of the increased rent paid by the Members) and “other benefits of the settlement.”  Plaintiffs contend in their Reply memorandum that though the landowners may not have had full knowledge of all the material facts, their ignorance was due to their own failure to investigate and they therefore should be estopped from denying ratification.

The 2004 Settlement Agreement actually has a provision stating:

5.22 <u>Revocation of Inconsistent Provision</u>: To the extent this Agreement is inconsistent with the provisions of any of the Prior Documents listed above, the terms of this Agreement shall be deemed to revoke such prior provisions to the extent of the inconsistency.

Ct. Rec. 90 at 66. The "Prior Documents" referred to included the Master Lease. *Id*. at 55.

The 2004 Settlement Agreement was not a "modification" and § 5.22 could not effectively operate to modify the Master Lease because 1) it was not an agreement between the same parties as the Master Lease; 2) there is no indication that Wapato Heritage was acting on behalf of the landowners; 3) the mere recital of a prior agreement or contract in a later one does not extinguish the earlier agreement; and 4) there is no evidence of the supposed alteration was mutual – there was no "meeting of the minds" between the parties to the Master Lease that the 2004 Settlement Agreement was intended to supplant, rescind or alter any terms of the Master Lease. *See Dragt v. Dragt/DeTray, LLC*, 139 Wash.App. 560, 571, 161 P.3d 473 (2007), review denied, 163 Wash.2d 1042, 187 P.3d 269 (2008)(Mutual modification of a contract by subsequent agreement arises out of the intentions of the parties and requires a meeting of the minds and separate consideration); *Wagner v. Wagner*, 95 Wash.2d 94, 103, 621 P.2d 1279 (1980); *Hanson v. Puget Sound Navigation Co.*, 52 Wash.2d 124, 127, 323 P.2d 655 (1958). Mutual assent is required and one party may not unilaterally modify a contract. *In re Relationship of Eggers*, 30 Wash.App. 867, 638 P.2d 1267 (1982).

Moreover, it is conceded that the Master Lease could be modified only with the consent of the Indian landowners. The landowners' acceptance of money from Wapato Heritage could not operate to unwittingly bind the owners to an agreement executed by Wapato Heritage LLC and the Park Members. There is no evidence in the record that by acceptance of the money, the Indian landowners intended to alter the terms of the Master Lease to include a provision permitting the RV Park Members to occupy MA-8 until 2034. There is also no evidence that the Settlement Agreement modified the annual rental terms owed by Wapato Heritage under the Master Lease. Indeed, the Federal Defendants contend after making the increased payments to the Indian landowners, for the remaining years it paid them pursuant to the original rental terms of the Master Lease.

MEMORANDUM OPINION - 32

**b.**     **TEDRA does not bind the Defendant Landowners to the 2004 Settlement**

Plaintiffs alternatively assert that because the 2004 Settlement Agreement was entered into pursuant to Washington's Trust Estate Dispute Resolution Act, RCW 11.96A, it is therefore binding on the Indian landowners of MA-8 and the Settlement Agreement forecloses the United States' attempt to preclude the Plaintiffs' right to use and occupy the Mill Bay Resort through 2034. Plaintiffs' contend the Settlement Agreement "settled the controversy regarding the Members' rights to use and occupy the Mill Bay Resort until 2034." According to Plaintiffs, the Settlement Agreement should be binding upon the landowners because the BIA was provided actual notice of the proceeding which led to the 2004 settlement of its claims against Evans, as well as the Settlement Agreement itself.

The court rejects the United States' initial counter argument that the state court lacked jurisdiction over anything to do with MA-8. Contrary to the Federal Defendants' contention, there is no federal or state law which would have precluded the state court from assuming jurisdiction over a contract dispute pertaining to the right to *use* property held in trust property under a contract. Defendant's blanket assertion that "federal law...applies to MA-8" is an incorrect overstatement.

Settlement agreements entered under TEDRA, RCW 11.96A.220, are "binding and conclusive on all persons interested in the estate or trust." RCW 11.96A.220. TEDRA requires notice of settlement agreements made under the statute be provided to all persons interested in the estate. Plaintiffs' admit that the MA-8 landowners qualified as "interested parties" to the Evans' estate - yet they did not receive notice. The BIA, but not the MA-8 landowners, received notice of the 2004 Settlement Agreement and had the opportunity to object to it. While the BIA has administrative authority to approve and manage leasehold interests on trust property, the BIA had no independent authority to modify or alter the terms of the Master Lease or to approve the Park Members' right to use the MA-8 property beyond the terms of the Master Lease. Thus, contrary to Plaintiffs' contention, the BIA "as an agent of the MA-8 landowners" could not settle the controversy regarding the Members' right to

MEMORANDUM OPINION - 33

use and occupy the Mill Bay Resort under the terms of the Master Lease.  That issue was not before the Chelan County court.  While the Chelan County state court could resolve the contractual issues between Evans and the Park Members pertaining to their agreement under the camping memberships, it did not have before it the question of whether the camping membership agreement (or their settlement agreement) complied with the terms of the Master Lease.  The Federal Defendants correctly state that determining the right to use MA-8 beyond what the Master Lease would permit would constitute an encumbrance on the leasehold interests of the lessors of the Master Lease.  TEDRA  does not provide an independent legal basis to bind the Defendant landowners to the terms of the 2004 Settlement Agreement.

### c.    Defendants are not Collaterally Estopped from Denying they are bound by the Terms of the 2004 Settlement Agreement

Plaintiffs also argue that collateral estoppel and res judicata operate to bar the Defendants from denying they are bound by the terms of the 2004 Settlement Agreement and preclude the United States from pursuing this trespass action.  To determine whether a nonparty "assumed control over" a previous action so as to be bound by its judgment, a court must evaluate whether the "relationship between the nonparty and a party was such that the nonparty had the same practical opportunity to control the course of the proceedings." 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 4451, p. 373 (2d ed. 2002).

Plaintiffs contend the BIA was a "laboring oar" with regard to the 2004 settlement.  It was informed of the litigation, it participated in the two days of mediation, it received notice of the settlement, and submitted a letter to the state court for consideration regarding its position.  Plaintiffs also point out that the BIA was asked to intervene in the case because of the implications "on the encumbrance of trust land," but it did not.   Plaintiffs argue the BIA was clearly not an outsider to the litigation and knew that it would affect their interests - but chose to stand on the sidelines.

MEMORANDUM OPINION - 34

Even if true, these circumstances do not demonstrate that the Defendant landowners or "the United States plainly had a sufficient 'laboring oar' in the conduct of the state-court litigation to actuate principles of estoppel." *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)(finding privity between the government and the civil contractor plaintiff in a prior action barred the government's subsequent suit where the government had required the contractor's lawsuit to be filed; reviewed and approved its complaint; paid its attorneys' fees and costs; directed the appeal from the state trial court to the Supreme Court; appeared before and submitted an amicus brief in the Montana Supreme Court; directed the filing of a notice of appeal to the Supreme Court; and "effectuated" the company's abandonment of that appeal). Although the BIA had an interest in the litigation, *cooperation* and discussions between individuals/entities, is not the same as control of a suit. This court cannot conclude on these facts that the BIA's involvement constituted a "full and fair" opportunity to litigate the issue of whether the Park Members had the right to remain on MA-8 until 2034. Collateral estoppel is intended to prevent injustice, primarily in procedural unfairness, where a party already had a chance to have a full and fair opportunity to hear an issue. On the facts here, there could be no conclusion reached that the BIA and the landowners were in privity with Wapato Heritage in the underlying state court litigation.

Collateral estoppel does not apply to preclude the Defendants from arguing the Plaintiffs do not have the right to occupy MA-8 until 2034.

**d.    Waiver, Laches, Accord and Satisfaction Do Not Bind the Landowners**

Plaintiffs also argue that the doctrines of waiver, laches, estoppel and accord and satisfaction operate to bind the Defendants to the terms of the 2004 Settlement Agreement. Each of these arguments rest upon the assumption that the state court litigation raised the issue which is raised here – but it did not. As the Lessee under the Master Lease, Evans/Wapato Heritage could not grant rights to Plaintiffs in the state court greater than what Evans had received under the Master Lease. Thus, the Settlement Agreement could only resolve the disputes between the RV Park Members entitlement to the leasehold interest in

MEMORANDUM OPINION - 35

MA-8 that Evans held.  That litigation could not attempt to resolve the issue of the extent of Evans' leasehold interest in MA-8, e.g. whether the Master Lease had been effectively renewed, or whether the RV Park Members' had the right to occupy MA-8 until 2034 pursuant to Evans' interests under the terms of the Master Lease.

The undisputed facts do not support Plaintiffs' assertion that Wapato Heritage "as a co-tenant" of MA-8 represented the interests of <u>all</u> the landowners in the 2004 settlement. All the facts indicate that Wapato Heritage was acting as the *lessee* who was resolving a dispute over the contracts with its licensees.

Moreover, the court rejects the argument that the Defendant landowners somehow ratified the 2004 Settlement Agreement by accepting the lump sum payment of money for the agreed additional rent to be paid by the RV members following the settlement.  The landowners were told that the money was from the settlement.  A party not bound by a contract may ratify a contract and then become bound by its terms, by affirming the contract by their words or deeds. One may be deemed to ratify a contract if, after discovery of facts that would warrant rescission, that party remains silent or continues to accept benefits under the contract. *Hooper v. Yakima County*, 79 Wn.App. 770, 775-76, 904 P.2d 1193 (1995), overruled on other grounds by *Del Rosario v. Del Rosario*, 152 Wn.2d 375, 97 P.3d 11 (2004).  Because the landowners were not party to the Settlement Agreement, the element which is missing here is any evidence of full knowledge of all the material facts.  A mere indirect or incidental benefit to a third person attributable to the fulfillment of a contract, to which he is not a party and has not knowingly accepted or ratified, is insufficient to render him legally responsible for it or bound by it.

### 3.    Plaintiffs' Equitable Right to Occupy Mill Bay Resort until 2034

Plaintiffs' Third and Fifth motions for summary judgment assert equitable estoppel prohibits the Defendants from denying Plaintiffs the right to use the Mill Bay Resort until 2034.  One would think that litigation revolving around such a straightforward issue as lease renewal would be rare.  It is after all, a dispute entirely avoidable by careful drafting and

MEMORANDUM OPINION - 36

lease administration. In fact, there are numerous cases involving inadequate, non-conforming, non-compliant renewal notices, which involve court's intervention in equity to avoid unconscionable hardships and fulfillment of commercial expectations. Noticeably there are a paucity of such cases in Washington. As this case demonstrates, this simple issue becomes very complex when it involves allotment property which has endured a century of fractionation in ownership, which is held in trust and controlled by the United States Bureau of Indian Affairs, and which is also prime real estate.

One can not consider this case without some sympathy for the predicament the Plaintiffs find themselves in. They have invested substantial sums of money relying primarily upon the word of Bill Evans and his entities, that the Master Lease option to renew would be exercised and that Evans' leasehold interest would not expire until 2034. Under the terms of the Master Lease, obtaining the renewal could not have been simpler. The consent of either the landowners or the BIA was not required. There was just one condition to be met: giving timely and proper notice of the exercise of the option. The deadline was February 1, 2008. One undisputable point in this case, evidenced by written and oral communications going back more than 20 years, is that Bill Evans' desired and intended to exercise the option, and apparently believed that the 1985 letter to the Secretary would suffice.

Additional facts making this case unique is that a non-party to the contract, the BIA, plays the lead role in its drafting, execution, approval, administration, and enforcement of the lease. As for the drafting of the lease, it is noted that at the time, the BIA had standard form leases it provided to potential lessees (including Evans) and terms it required in order to obtain its approval. Indeed, as 25 C.F.R Part 162 outlines, the Secretary's primary role in management and control is setting standard conditions for leases. In lease administration the BIA's duties are defined by statute and regulations created for trust lands which impose general fiduciary duties on the Government in its dealings with Indian allottees. In this case, upon receipt of Evans' 1985 letter explicitly purporting to exercise the option to renew, the BIA a) neglected to inform the Indian landowners, whose interests it is their duty to protect, of the letter; b) did

MEMORANDUM OPINION - 37

not ensure that their tenant (Evans) had complied with the requirements of the lease until over twenty-years later, despite numerous inquiries, and then c) conducted its business without questioning and on the explicit assumption that the lease had been effectively renewed. In 2004, the BIA even made affirmative representations to the State of Washington that the lease did not expire until February 2, 2034.

Although estoppel will rarely work against the government, the assertion of this defense against the Defendant landowners and the BIA, acting on their behalf, in this trespass action presents a unique context which would merit further consideration by the court. However, the court does not desire to waste judicial resources prematurely deciding disputes or to unnecessarily disrupt an agency's administrative decision making process. Given the facts of record suggesting Wapato Heritage is in the process of attempting to secure a 99-year lease, the court will not decide the claims of trespass and equitable estoppel without the parties first having evaluated the fitness of these issues for decision in light of the court's rulings herein.

**V. CONCLUSION**

For the reasons set forth herein, **IT IS HEREBY ORDERED:**

1. The Federal Defendants' Motion to Dismiss and for Summary Judgment **(Ct. Rec. 70)** is **GRANTED in PART** and **DENIED in PART**. Plaintiffs' Complaint against the United States Defendants shall be dismissed for lack of subject matter jurisdiction and alternatively, for failure to state a claim upon which relief can be granted. The Federal Defendants' motion for summary judgment on its trespass counterclaim is denied with leave to renew.

2. Plaintiffs' First Motion for Summary Judgment Re: Contract Terms **(Ct. Rec. 77)** is **DENIED**.

3. Plaintiffs' Second Motion for Summary Judgment Re: Settlement Agreement **(Ct. Rec. 79)** is **DENIED**.

4. Plaintiffs' Fourth Motion for Partial Summary Judgment Re: Arbitrary and Capricious Agency Action and Due Process Violation by BIA **(Ct. Rec. 83)** is **DENIED**.

MEMORANDUM OPINION - 38

5. Plaintiffs' Third Motion for Partial Summary Judgment Re: Estoppel **(Ct. Rec. 81)** and Fifth Motion for Summary Judgment Re: Actual Notice of Option to Renew **(Ct. Rec. 85)** are **DENIED** with leave to renew.

6. The court has granted the parties leave to renew certain motions. These motions shall only be renewed with supplemental evidence and further points and authorities demonstrating judicial action on the motion is appropriate.

7. The United States shall within ten (10) days of this order file a statement setting forth its reasons for failing to enter notices of appearance on behalf of the individually named defendant allottees pursuant to 25 U.S.C. § 175 and *Siniscal v. United States*, 208 F.2d 406, 410 (9th Cir. 1953).

The Clerk of this court shall enter this Memorandum Opinion and forward copies to counsel.

Dated this 12th day of January, 2010.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE