FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 09, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| PAUL GRONDAL, a Washington resident, | NO: 2:09-CV-18-RMP |
| Plaintiff, | |
| v. | ORDER DENYING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT RE EJECTMENT |
| MILL BAY MEMBERS ASSOCIATION, INC., a Washington non-profit corporation; UNITED STATES OF AMERICA; UNITED STATES DEPARTMENT OF INTERIOR; BUREAU OF INDIAN AFFAIRS; FRANCIS ABRAHAM; CATHERINE GARRISON; MAUREEN MARCELLAY, MIKE PALMER, also known as Michael H. Palmer; JAMES ABRAHAM; NAOMI DICK; ANNIE WAPATO; ENID MARCHAND; GARY REYES; PAULWAPATO, JR.; LYNN BENSON; DARLENE HYLAND; RANDY MARCELLAY; FRANCIS REYES; LYDIA W. ARMEECHER; MARY JO GARRISON; MARLENE MARCELLAY; LUCINA O'DELL; MOSE SAM; SHERMAN T. WAPATO; SANDRA | |

COVINGTON; GABRIEL
MARCELLAY; LINDA MILLS;
LINDA SAINT; JEFF M. CONDON;
DENA JACKSON; MIKE
MARCELLAY; VIVIAN PIERRE;
SONIA VANWOERKON;
WAPATO HERITAGE, LLC;
LEONARD WAPATO, JR.;
DERRICK D. ZUNIE, II;
DEBORAH L. BACKWELL; JUDY
ZUNIE; JAQUELINE WHITE
PLUME; DENISE N. ZUNIE;
CONFEDERATED TRIBES
COLVILLE RESERVATION; and
ALLOTTEES OF MA-8, also known
as Moses Allotment 8,

                      Defendants.

---

      This case involves an eleven-year dispute over land on the banks of Lake

Chelan known as Moses Allotment No. 8, or "MA-8."  MA-8 is highly fractionated

allotment land, held in trust by the United States Government for Indian allottees

who are predominantly members of the Confederated Tribes of the Colville

Reservation.  Plaintiffs in this case are non-Indians who represent a group of

individuals who purchased camping memberships to use MA-8 for recreational

purposes allegedly through 2034.  Plaintiffs purchased these camping memberships

from William Evans Jr., who had leased MA-8 from the Indian allottees in

accordance with federal regulations, in order to sell camping memberships to

Plaintiffs.  The problem is that Evans' lease of MA-8 expired in 2009, not 2034, due

to his failure to renew it.  Because Plaintiffs' right to use MA-8 flowed from Evans'

lease, that right expired in 2009 along with the lease.

The Court acknowledges that Plaintiffs in this case did not receive what they

expected from Evans and his successor in interest, Wapato Heritage, LLC.

However, Plaintiffs may not continue to occupy Indian trust land without legal

authority to do so.

**BACKGROUND**

*The Moses Allotments[1]*

As described in more detail below, the Moses Allotments are reservation

allotments that the Government created consistent with the Moses Agreement for

individual Indians that the Government recognized as members of the "Moses Band"

of Indians.  In 1907, pursuant to the Moses Agreement, MA-8 was allotted to

Wapato John via a trust patent, issued by the United States.  After Wapato John died,

his interests in MA-8 passed to his heirs, and the land became fractionated.

*Evans, the Master Lease, and the Development of MA-8*

It is undisputed that, by 1979, William Evans, Jr., an heir of Wapato John,

owned approximately 5.4% of the beneficial ownership in MA-8.  *See Wapato*

*Heritage L.L.C. v. United States*, 637 F.3d 1033, 1035 (9th Cir. 2011).  Evans

---

[1] Except for the issue of MA-8's trust status, the historical background of this case is largely undisputed.  The Court expressly notes disputed issues of fact in this Order.

1    wanted to use MA-8 to generate a profit for himself and the other allottee

2    landowners. However, as he only owned a small fraction of the beneficial interest in

3    the land, he could not control the land. *See* ECF No. 90-6 at 9 ("Mr. Evans is very

4    much aware of the Lake Chelan-Manson Area and feels strongly that an R.V.

5    Development would provide good solid monies to the landowners."). Thus, Evans

6    began communicating with the other allottee landowners, to lease MA-8 from them

7    and control the property. *See id*. Although it is now contested, at that time it was

8    agreed that MA-8 was trust land. Therefore, any lease of MA-8 had to be approved

9    by the Secretary of the Interior through the BIA. *See* 25 U.S.C. § 415.

10    Eventually, Evans obtained approval for his proposed lease from 64% of the

11    Indian allottee landowners with an interest in MA-8. *Wapato Heritage, L.L.C.*, 637

12    F.3d at 1035. On February 2, 1984, the Colville Agency, on behalf of the BIA,

13    approved the lease of MA-8 to Evans. *See id*.; ECF No. 90-6 at 23–24. Pursuant to

14    federal regulations, the BIA consented to the lease on behalf of the remaining 36%

15    of the trust interest. *Wapato Heritage, L.L.C.*, 637 F.3d at 1035.

16    This "Master Lease" granted use of MA-8 to Evans for a period of twenty-five

17    years, beginning in 1984. The Master Lease defined Evans as the "Lessee" and the

18    individual Indian landowners as "Lessor." *Wapato Heritage, L.L.C.*, 637 F.3d at

19    1040 (holding that "the BIA was not the lessor" to the Master Lease); *see* ECF No.

20

21

90-2 at 1.  These individual landowners' names and addresses purportedly were listed in an Exhibit to the Master Lease. [2]  *Id*.

The Master Lease contained a renewal option, which would allow Evans to renew the lease for up to 25 years.  ECF No. 90-2 at 3. To renew the Master Lease, Evans was required to give notice to the "Lessor" and the Secretary in writing one year prior to the expiration of the initial 25-year lease term. [3]  *Id*.  Thus, Evans would have needed to give notice of renewal to the Lessor by 2008.

On January 30, 1985, Evans sent a letter to the Colville Agency, referencing the Master Lease.  *See* ECF No. 90-6 at 25.  The language of the letter indicates that

---

[2] According to Judge Whaley in the related case, *Wapato Heritage, L.L.C. v. United State*s, the exhibit attached to the lease also listed the BIA Superintendent of the Colville Agency as lessor to function as a "guardian" of the other Indian landowners not listed in the lease, due to the fractionated nature of the land.  *See* ECF No. 30 at 3 in Case No. 2:08-cv-177-RHW.  According to Judge Quackenbush, the previous judge presiding over this litigation, "There is no 'Exhibit A' of record and no evidence in the record whether 'Exhibit A' ever existed.  The Master Lease contains just two signatures.  It was signed by Evans as 'Lessee' and under 'Lessor' was the signature of George Davis, Secretary of the BIA."  ECF No. 144 at 5.

[3] Evans created two separate companies through which he conducted business related to MA-8, Mar-Lu, Ltd. and Chief Evans, Inc.  Almost immediately after obtaining the Master Lease, Evans subleased a portion of MA-8 to Mar-Lu, Ltd. to develop the property and create Mill Bay RV Resort.  The sublease stated that it would "expire on the date of the expiration of the Master Lease and exercised extension option, if any, whichever be later."  ECF No. 90-4 at 4 (Mar-Lu Ltd. sublease).  For clarity, the Court will consider the actions of Mar-Lu, Ltd. and Chief Evans, Inc. to be the actions of Evans.  This is consistent with the Court's prior rulings and the parties' arguments.

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS FOR SUMMARY JUDGMENT ~ 5

Evans intended to exercise his option to renew the Master Lease. *See id*. The letter stated:

> In accordance with paragraph three (3) of the subject lease dated February 2, 1984, you are notified by receipt of this letter that Mar-Lu, Ltd. [Evans's company] hereby exercises its option to renew the subject lease for a further term of twenty five (25) years to be effective at the expiration of the original twenty five (25) year term. This notice extends the total term for the subject lease to February 1, 2034.

*Id*. Although Evans stated an intent to renew the Master Lease, he did not notify any of the Indian Landowners in writing of his intent to renew, nor did he send any notice through certified mail, as required by the Master Lease. *Wapato Heritage, L.L.C.*, 637 F.3d at 1040.

The BIA never communicated with Evans to notify him about the status of the lease renewal, or to offer a formal opinion about whether the lease was effectively renewed. As Judge Whaley found in related litigation about the Master Lease and MA-8, "The issue [of the Master Lease's renewal] simply never arose, formally, because the BIA was never asked to make such an administrative decision until 2007." ECF No. 30 at 4 in Case No. 2:08-cv-177-RHW. However, the BIA approved and signed documents after receiving the letter from Evans, indicating that the Agency assumed that the lease had been renewed and thus would expire in 2034. *See e.g.*, ECF No. 90-4 at 10–31.

After obtaining the Master Lease, Evans began developing an RV park on MA-8, the Mill Bay RV Resort. "The original plan Evans envisioned included 750

RV sites that would occupy the entire parcel of MA-8 but [sic] changed the plan and decided to construct a golf course and limit the number of RV sites." ECF No. 1 at 5; ECF No. 90-6 at 42. Evans sold camping memberships to those interested in using the Mill Bay Resort for recreational purposes.

In 1989, "Evans submitted a plan to revise the RV Resort plan in order to provide members with 'expanded memberships.'" ECF No. 1 at 5; *see also* ECF No. 90-6 at 42. These expanded memberships allowed purchasers to use a designated RV space at Mill Bay Resort for recreational purposes, consistent with the "Expanded Membership Sale Agreement," until 2034. *See* ECF No. 16-3; *see also* ECF No. 90-6 at 42 (twenty-four sites to be marketed as "Expanded Memberships"). The agreements were executed between the interested purchasers (the "Purchasers") and Evans's company, Chief Evans, Inc. (the "Seller"). ECF No. 16-3 at 1. The Expanded Membership Sale Agreement describes the nature of the expanded membership as follows:

> This membership constitutes only a contractual license to use such facilities as may be provided by Seller from time to time. Such facilities are subject to change and this membership therefore has no application to, does not constitute an interest in, is not secured by, and does not entitle the Purchaser to any recourse against any particular real property facilities. This contract does not entitle the Purchaser to participate in any income or distribution of Seller or of any of its facilities, . . . or to vote or participate on any aspect relating to the business of Seller. The duration of this membership is coextensive with the fifty (50) year term commencing February 2, 1984, of Seller's lease for the Mill Bay property, which lease was entered into between the United States Department of the Interior, Bureau of Indian Affairs, and William W.

Evans, Jr., on February 2, 1984, and subsequently assigned by William W. Evans Jr., to Seller.

ECF No. 16-3 at 6.

The BIA approved the requested modification of the Master Lease, which allowed Evans to sell these expanded memberships. When it approved the modification, the BIA did not address whether the Master Lease had been properly renewed, even though the expanded memberships indicated that the Master Lease had been renewed. *See* ECF No. 90-6 at 26–45 (Master Lease modification materials).

Paul Grondal was among the first individuals to purchase an expanded membership from Evans. Regarding these memberships, Grondal asserts, "Evans and his sales staff represented to all prospective purchasers, both verbally and with documentation, that his agreement with the BIA and his long-term land lease on 'trust land' was good for the full 50 year term of the lease until 2034." ECF No. 16 at 3.

The value of MA-8, and thus the value of the expanded memberships, has increased significantly since 1989. Under the Expanded Membership Sale Agreement, the purchasers were allowed to sell their memberships at an increased price. Plaintiffs plead, "Upon information and belief, new members have paid up to three times that of the original price in order to purchase a camping membership valid until 2034." ECF No. 1 at 21.

In 1993, Evans entered into a sublease with Colville Tribal Enterprise Corporation, allowing the Corporation to build a casino on a portion of MA-8 that is not part of the Mill Bay Resort. *See* ECF No. 90-4 at 10–31. The BIA approved the sublease, which also indicated that the Master Lease would expire in 2034. *Id*. at 12 (sublease "Term" provision).

### *Evans Attempts to Cancel the Mill Bay Memberships and Litigation Ensues*

In 2001, members of the Mill Bay Resort ("Mill Bay Members"), including Grondal, received a letter from Evans' company, Chief Evans, Inc., stating that the park was closing at the end of 2001 and all membership contracts would be cancelled at that time. ECF No. 16 at 5.

The Mill Bay Members sued Evans in state court over the potential cancellation of their camping memberships/contracts. *Id*. at 5–6. Before the litigation was resolved, Evans died. However, prior to his death, Evans established Wapato Heritage, LLC, and, when he died, his leasehold interest as the lessee of MA-8 was acquired by Wapato Heritage, LLC. ECF No. 144 at 9 (Court's prior Order). Presently, Wapato Heritage possesses a life estate in Evans' MA-8 allotment interest (approximately 23.8% of MA-8) with the remainder reverting to the Confederated Tribes of the Colville Reservation. *Id*. at 9 n.3. Because Wapato Heritage is Evans's successor in interest, it participated in the state-court litigation with the Mill Bay Members after Evans' death. Wapato Heritage resolved the state-

1    court litigation with the Mill Bay Members through mediation and a Settlement

2    Agreement.  *See* ECF No. 16-5 (Settlement Agreement).

3         The Settlement Agreement between Wapato Heritage and the Mill Bay

4    Members expressly recognized the extension of the Master Lease through 2034.

5    ECF No. 16-5 at 7.  As this Court previously stated, "A key issue involved in the

6    mediation was the RV Park Members' desire to remain on MA-8 through 2034.

7    ECF No. 144 at 9–10.  The settlement proposals and the final agreement explicitly

8    recognized the Mill Bay Members' 'right to continued use of the Park until

9    December 31, 2034,' though it also recognized that this right was subject to the

10   terms of 'the Master Lease with the BIA.'"  *Id*. at 9 (quoting the Settlement

11   Agreement).

12        To remain on the land, Plaintiffs agreed to pay Wapato Heritage, Evans'

13   successor in interest, increased "rent" through 2034.  ECF No. 16-5 at 7 (rent rate

14   schedule through 2034).  The BIA did not intervene in the mediation formally, but

15   its agents were aware of the mediation and attended hearings.  The nature of the

16   BIA's involvement, and the extent to which its agents informally participated in the

17   settlement negotiations, is disputed.  *See* ECF No. 144 at 10.  The individual allottee

18   landowners were not parties to the settlement, and there is no evidence that they

19   were involved in the settlement negotiations whatsoever.  *See* ECF No. 16-5 at 1.

20   / / /

21   / / /

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 10

*Review of the Master Lease's Purported Renewal*

The BIA did not examine or question the legal efficacy of the purported renewal of the Master Lease until 2007. In its Order at ECF No. 144, this Court detailed numerous instances in which the BIA was asked to address the terms of the Master Lease but did not do so. For instance, in 2004, Evans' daughter asked whether the extension of the master lease had any effect on the renewal of the RV Park sublease. ECF No. 144 at 11 (citing ECF No. 90-10 at 29–31). However, it appears that the BIA did not undertake such a review until 2007.

Plaintiffs allege that the BIA began to question the status of the Master Lease renewal in response to a letter from the Confederated Tribes of the Colville Reservation. *See* ECF No. 144 at 12.[4] In 2007, the BIA sent a letter to Wapato Heritage, stating its position that Evans never had exercised his option to renew the Master Lease. ECF No. 90-15 at 8. The BIA asserted that Evans had failed to provide notice of his intent to renew the Master Lease to the allottee landowners, who were the "Lessor." Instead, Evans only provided notice to the Colville Agency.

---

[4] Plaintiff Grondal suggests that the BIA and the Confederated Tribes of the Colville have colluded for years in an attempt to take MA-8 from Plaintiffs prematurely, so that the Tribes may expand their casino operations on MA-8 before 2034. *See* ECF No. 16 at 5 (Decl. of Paul Grondal explaining, "[R]umors began circulating that the Colville Tribe was planning on moving the Mill Bay Casino onto the Mill Bay Resort RV Park property"). At the hearing regarding the instant motions, Defendant/Cross-Claimant Wapato Heritage also argued that the Government is inappropriately favoring the Confederated Tribes of the Colville with respect to MA-8's use.

*See id.* Because this action was insufficient to renew the Master Lease, the lease would expire in 2009, rather than 2034. The letter noted that the Agency's review was ongoing, and that, if Wapato Heritage had any record supporting renewal of the Master Lease, it should provide a copy of such record to the Colville Agency. *Id.*

When Wapato Heritage received notice that Evans had not effectively renewed the Mater Lease, there were two months remaining during which Wapato Heritage could have renewed the Master Lease by providing notice to the landowners. *See* ECF No. 90-15 at 15 (letter dated Dec. 18, 2007). As the Court already has pointed out, the process for renewal was simple; it only required that notice be given to the landowners and did not require the landowners' approval or consent. Instead of properly exercising the option to renew the Master Lease in those two months, Wapato Heritage's counsel sent the BIA a letter, disagreeing with the BIA's decision. *Id.* at 15–17.

### *Wapato Heritage, LLC v. United States*

On June 9, 2008, Wapato Heritage filed an action in the Eastern District of Washington against the United States challenging the BIA's decision that Evans had not renewed the Master Lease. *See Wapato Heritage LLC v. United States*, No. 08-cv-177-RHW. In that case, Wapato Heritage argued that the Master Lease had been renewed. In the alternative, Wapato Heritage asserted that the BIA's repeated approvals of Evans' exercise of the option to renew extended the Master Lease to February 2, 2034. Additionally, Wapato Heritage argued that a balance of the

equities required finding that the Master Lease had been renewed.  The Court

rejected Wapato Heritage's arguments, found that Evans had never renewed the

Master Lease, and eventually dismissed Wapato Heritage's case against the

Government.

Wapato Heritage appealed, and the Ninth Circuit affirmed the district court's

decision, stating:

> [W]e hold that the Lease is not ambiguous and that the BIA was not the
> Lessor.  Because the BIA was not the Lessor, the Lease terms required
> that Wapato [Heritage] notify the BIA and the landowners directly via
> certified mail, which it did not do . . . Moreover, there is no evidence in
> the record that the Lessee requested that the BIA furnish it with the
> current names and addresses of the Landowners, as it was permitted to
> do under Section 29 of the Lease.  Accordingly, we hold that Wapato
> [Heritage]'s option to renew the Lease was not effectively exercised by
> Evans, or later by Wapato [Heritage], and that the Lease terminated
> upon the last day of its 25-year term.

*Wapato Heritage, L.L.C. v. United States*, 673 F.3d 1033, 1040 (9th Cir. 2011).

Thus, the Ninth Circuit found that the Master Lease was not renewed and that it

expired in 2009, on the last day of its 25-year term.

### *Initiation of the Instant Litigation*

Before the Ninth Circuit reached its decision in *Wapato Heritage L.L.C. v.

United States*, Plaintiff Grondal and the Mill Bay Members Association filed the

instant action in this Court.  The Complaint in this matter was filed on January 21,

2009.  ECF No. 1.  Plaintiffs' Complaint asserts claims against Wapato Heritage, the

Federal Government (United States, Department of Interior, and Bureau of Indian

Affairs), and individual allottee landowners with interests in MA-8.  The issues

raised in the present litigation are similar to those raised in *Wapato Heritage L.L.C.*

*v. United States*: Plaintiffs advance various arguments as to why they are entitled to

occupy MA-8 until 2034, even though the Master Lease was not renewed.  In its

Answer to the Complaint, the Government asserts a counterclaim of trespass,

requesting ejectment of Plaintiffs from MA-8.  ECF No. 42 at 24–25.  The

Government asserts that Plaintiffs, who have camping membership contracts with

Wapato Heritage, have no right to remain on MA-8, as the Master Lease of MA-8

between Evans and the allottee landowners has expired.

Defendant Wapato Heritage filed several cross claims against all Defendants

requesting equitable relief.  *See* ECF No. 170.  The Government filed a crossclaim

against Wapato Heritage, alleging that Wapato Heritage has failed to pay rent under

the Master Lease.  *See* ECF No. 198 at 11.  The Court does not address the merits of

these crossclaims in this Order, as the parties have not addressed them in the

motions presently before the Court.

**Court's 2010 Memorandum Opinion at ECF No. 144**

The Court addressed Plaintiffs' claims and the Government's trespass

counterclaim in its Order at ECF No. 144.  Plaintiffs' first three causes of action

requested declaratory relief based on the equitable defenses of estoppel, waiver and

acquiescence, and modification.  The Court dismissed Plaintiffs' first three claims

for lack of subject matter jurisdiction.  The Court also found those claims were

barred by issue preclusion due to the district court decision in *Wapato Heritage*

*L.L.C. v. United States*.  (At the time of that Order, the Ninth Circuit had not yet

affirmed the district court's decision.)  Similarly, the Court dismissed Plaintiffs'

fourth and fifth causes of action, which requested relief under the Administrative

Procedures Act and the Fifth Amendment of the Constitution, for lack of subject

matter jurisdiction.

However, the Court found that it has subject matter jurisdiction over the

Government's trespass counterclaim, which requests Plaintiffs' ejectment from MA-

8.

The Court then construed language in Plaintiffs' Complaint as a claim for

declaratory relief against the individual allottee landowners, to prevent them from

denying Plaintiffs' right to occupy MA-8.  ECF No. 144 at 24.  This request for

declaratory relief is Plaintiffs' only remaining claim, and the Court has characterized

it as follows:

> Plaintiffs' (The Mill Bay Members Association and Paul Grondal)
> claim against the MA-8 landowner Defendants, other than the Tribe, to
> declare them "equitably, collaterally, or otherwise estopped from
> denying the Plaintiffs their right to use Mill Bay Resort until February
> 2, 2034."

ECF No. 329 at 23 (quoting ECF No. 1 at 43; ECF No. 197 at 2).

In its Order at ECF No. 144, the Court also addressed the merits of the

Government's trespass counterclaim, as the Government had moved for summary

judgment on that claim.  ECF No. 144 at 24.  The Court denied the Government's

motion for summary judgment, with leave to renew, finding that the ejectment of Plaintiffs potentially was premature at that time. *Id.* The Court explained that, because the Government was not a party to the Master Lease, it has no contractual right to seek the ejectment of Plaintiffs from MA-8. Rather, any right that the Government has to eject Plaintiffs from the land stems from the land's trust status. The Court explained, "The Government holds the allotment in trust for the allottees and has the power to control occupancy on the property and to protect it from trespass." *Id.* at 25 (citing *United States v. West*, 232 F.2d 694, 698 (9th Cir. 1956)).

The Court then examined the federal regulations governing the BIA's responsibilities in administering and enforcing leases on trust land, in order to decide if the BIA was acting consistent with those regulations in seeking Plaintiffs' ejectment. Those regulations have since been revised, and the provisions upon which the Court relied have been removed. Prior to the revision of the applicable regulations, the Court identified 25 C.F.R. § 162.623 as relevant to the Government's trespass claim in this case. It stated:

> If a tenant remains in possession after the expiration or cancellation of a lease, we will treat the unauthorized use as a trespass. Unless we have reason to believe that the tenant is engaged in negotiations with the Indian landowners to obtain a new lease, we will take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law.

25 C.F.R. § 162.623, *removed*, 77 FR 72440, 72494, Dec. 5, 2012. Finally, the Court explained that, pursuant to 25 C.F.R. § 162.619, the BIA must "consult with

the Indian landowners, as appropriate," to determine whether the holdover tenants should be given additional time to cure. 25 C.F.R. § 162.619, *removed*, 77 FR 72440, 72494, Dec. 5, 2012. The Court found that these "regulations make clear that the entire purpose of the authority and remedies provided to the BIA for lease violations is to ensure that the landowners' property and financial interests are protected." ECF No. 144 at 25.

When the Court addressed the Government's 2009 motion for summary judgment on its trespass counterclaim, it was unclear from the record whether the BIA had consulted with the Indian landowners. There was no evidence that the Government brought the trespass action in response to the landowners' concerns. Accordingly, the Court found that the ejectment action was premature.

Additionally, when the Court first ruled on the Government's trespass counterclaim, it appeared from the record that Wapato Heritage was attempting to negotiate a new lease with the landowners. If Wapato Heritage had managed to negotiate a new lease with the landowners, the Court reasoned that the ejectment action by the Government would have been improper, as it would have been contrary to the allottee landowners' interests and desires.

Thirdly, the Court reasoned that the ejectment action was premature because the Ninth Circuit had accepted review of, but had not yet decided, *Wapato Heritage L.L.C. v. United States*, the related case decided by Judge Whaley. Therefore, at that

time, it was possible that the Ninth Circuit would conclude that the Master Lease

had been renewed and would remain in effect until 2034.

Accordingly, the Court held the following with respect to the Government's

trespass counterclaim/ejectment action in its Order at ECF No. 144:

> If efforts to obtain approval on the [new] lease are actually ongoing, or
> the BIA has yet to consult with the Indian landowners in regards to the
> issue of Evans' failure to properly renew under the Master Lease, then
> the BIA's trespass action is inappropriate.  Premature adjudication of
> the United States' trespass action is especially inappropriate in the
> circumstances of this case, where it seeks to displace Plaintiffs from
> their residence on the property.  The ejectment remedy sought could all
> be for nothing, *if* the [new] lease proposal is granted or if appellate
> review should result in a different outcome in [*Wapato Heritage L.L.C.
> v. United States*].

ECF No. 144 at 27.  Consistent with the Court's reasoning that the ejectment action

was premature in 2010, the Court denied the Government's motion for summary

judgment on its trespass counterclaim with leave to renew.  The Court warned that,

if the Government opted to renew its motion, it needed to provide evidence showing

that it had complied with the relevant federal regulations, and evidence showing that

the action was otherwise ripe.

**Government's Renewed Motion for Summary Judgment re Ejectment and the New
Issue of MA-8's Trust Status**

In March of 2012, the Government renewed its Motion for Summary

Judgment re Ejectment, one of the motions pending before this Court.  The

Government argues that the ejectment action is timely for several reasons: (1) no

new lease has been negotiated with the landowners, and no negotiations are ongoing;

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 18

(2) the Government consulted with the Indian landowners after *Wapato Heritage L.L.C. v. United States* was decided, and the landowners support ejectment; and (3) the Ninth Circuit ruled in *Wapato Heritage L.L.C. v. United States* that the Master Lease had not been renewed and therefore had expired. ECF No. 232 at 12. Accordingly, the Government argues that there is no reason to delay a decision on its pending motion.[5]

In response to the Government's renewed Motion for Summary Judgment re Ejectment, Plaintiffs raised a new argument as to why the Government's ejectment action should fail: MA-8 is not trust land. As the Court previously explained in its Order at ECF No. 144, the Government's authority to seek ejectment was rooted in its trust obligation, not any contractual right related to the Master Lease. Accordingly, if the land is not trust land, then the Government has no authority to seek the ejectment of Plaintiffs on behalf of the landowners. Defendant/Cross-Claimant Wapato Heritage is aligned with Plaintiffs on this issue and argues that MA-8 fell out of trust status long before the Master Lease's inception.

The Court pauses in its recitation of the facts and procedural history of this case to note that the argument that Plaintiffs now assert regarding MA-8's trust

---

[5] In 2012, certain individual allottees filed a motion to join the Government's renewed Motion for Summary Judgment re Ejectment. ECF No. 344.

status contradicts Plaintiffs' prior arguments and assertions in this matter. Indeed,

Plaintiffs' very first allegation is:

> The Bureau of Indian Affairs . . . is responsible for the management and control of Indian allotment lands. The Superintendent of the BIA's Colville Indian Agency (the "Colville Agency"), acting as an agent of the United States oversees and manages federal allotment land held in trust for Indian allottees known as Moses Agreement Number Eight ("MA-8").

ECF No. 1 at 2–3.

Moreover, Plaintiffs' claims against Defendants were premised on MA-8's

status as trust land. For instance, in order to assert its estoppel claim against the

BIA, Plaintiffs alleged, "The BIA was authorized to bind the United States in

regards to the leasing of MA-8 as land owned by the United States in trust for the

benefit of the Allottees." *Id*. at 34.

### *Additional Discovery Allowed*

On April 12, 2012, Plaintiffs filed a Motion to Continue the Government's

Summary Judgment Motion Pursuant to Fed. R. Civ. P. 56(d). ECF No. 246. In

response, the Court found that Plaintiffs had not had a chance to conduct discovery

and granted Plaintiffs' motion to continue. *See* ECF No. 267 at 9–10. Shortly

thereafter, the Court issued a scheduling order governing discovery related to the

Government's renewed Motion for Summary Judgment re Ejectment. ECF No. 272.

The Court ordered, "All discovery *related to the Federal Defendants' Motion for*

*Summary Judgment Re: Ejectment* shall be completed on or before November 1,

2012." *Id*. at 2 (emphasis in original). The Court also explained that it would set "further discovery/motion deadlines, as well as trial deadlines and dates, if required," after ruling on the Government's renewed Motion for Summary Judgment re Ejectment. *Id*. at 3.

### Representation of Individual Indian Allottees and Transfer of Case

On August 1, 2014, this Court issued a ruling related to the dispositive motions pending before it, which included the instant Motion for Summary Judgment re Ejectment (ECF No. 231) and the Tribe's Motion to Dismiss the cross-claims of Wapato Heritage (ECF No. 274). ECF No. 329. The Court found that a key issue in deciding the pending motions was the legal status of MA-8. *Id*. at 2 ("The two pending dispositive motions hinge upon the Plaintiffs' and Defendant Wapato Heritage's contentions that MA-8's trust period has expired and that the United States therefore lacks standing to seek ejectment as trustee.").

Because many of the individual allottee landowner Defendants had not appeared in the action, and because the action now raised the issue of MA-8's trust status, the Court became concerned about the landowners' lack of legal representation. The Court ordered the BIA to take steps to ensure that the individual landowners had legal representation, stating, "The Court desires to give all of the individual landowner Defendants the opportunity to inform the court of their positions in this case after consultation with legal counsel." *Id*. at 32–33. The Court

1  indicated that it would not rule on the pending motions until all of the individual

2  landowners were represented by counsel.  *Id*.

3          On September 17, 2019, this case was transferred.  Shortly thereafter, the

4  parties submitted status reports, identifying the remaining issues, and a status

5  conference was held.  The Government and the Confederated Tribes of the Colville

6  Reservation asked the Court to rule on the Governments' renewed Motion for

7  Summary Judgment re Ejectment.  Plaintiffs and Wapato Heritage, who have been

8  aligned with respect to every motion since the case was transferred, argued that,

9  because the Government had not furnished independent counsel for each individual

10  allottee Defendant, the Court could not decide the Government's ejectment action.

11          In response to the parties' arguments, the Court set a briefing schedule to

12  resolve the issue of representation for the individual allottee Defendants.  The Court

13  then resolved that issue in its Order at ECF No. 411, finding that, pursuant to Ninth

14  Circuit precedent, the Government need not take additional steps to provide

15  independent counsel to the individual allottee Defendants in this case.  Accordingly,

16  even though the Court previously stated that it would not rule on the pending

17  motions until each individual landowner was represented, the Court concluded that,

18  consistent with recent Ninth Circuit precedent, there simply was no legal basis to

19  delay a resolution of this case on the grounds that the Government had failed to

20  provide private attorneys to all of the landowners.  Additionally, the Court found

21  that the Government had taken steps to ensure that the landowners who requested

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 22

representation would receive it and that some of the landowners had received *pro bono* representation due to the Government's efforts.

With the representation issue decided, the Court turned to the Government's pending renewed Motion for Summary Judgment re Ejectment, ECF No. 231. The Court acknowledged that the briefing on that motion was stale, and so it set a briefing schedule for supplemental briefing on that motion specifically. ECF No. 411 at 10. The Court directed the parties to file supplemental briefs identifying "any new, relevant precedent or facts that were not previously briefed" related to the Government's pending Motion for Summary Judgment re Ejectment. *Id*. The parties filed supplemental briefing.

***Plaintiff Files Dispositive Motions in 2020***

In addition to their supplemental briefing on the Government's pending Motion for Summary Judgment re Ejectment, Plaintiffs filed two new dispositive motions. On April 14, 2020, Plaintiffs filed a Motion for Default Judgment Against Certain Allottee Defendants, requesting that the Court enter default judgment against non-appearing individual allottee Defendants. ECF No. 433. On April 17, 2020, Plaintiffs filed a Motion for Summary Judgment Against Certain Individual Allottees. ECF No. 439. Cross-Claimant Wapato Heritage supports both motions.

With respect to Plaintiffs' recently filed dispositive motions, the Court concluded that they raise issues related to the Government's Motion for Summary Judgment re Ejectment. Accordingly, the Court issued a consolidated briefing

schedule for the Plaintiffs' two dispositive motions, ECF Nos. 433 and 439.

Additionally, the Court stated its intent to resolve the following motions in one,

global resolution: the Government's Motion for Summary Judgment re Ejectment

(ECF No. 321), the Plaintiffs' Motion for Default Judgment Against Certain Allottee

Defendants (ECF No. 433), and the Plaintiffs' Motion for Summary Judgment

Against Certain Individual Allottees (ECF No. 439).

## DISCUSSION

### I.    MA-8's Trust Status

As described above, the parties dispute whether MA-8 is trust land.  In stark

contrast to their prior positions, Plaintiffs and Wapato Heritage now argue that the

land is not trust land.  The Government, the Confederated Tribes of the Colville

Reservation ("CTCR"), and various individual allottee Defendants maintain that the

allotment remains in trust.  Whether MA-8 is Indian trust land is a threshold

question that the Court must address, in part because if the land is not trust land, then

the Government is not a proper party to this action and has no standing to eject

Plaintiffs.

### A. Judicial Estoppel

The Government argues that Plaintiffs should be precluded from asserting that

MA-8 is not trust land under the doctrine of judicial estoppel.  That doctrine

prevents a party who takes one position from later assuming a second, contradictory

position on the same issue, either in the same litigation or in subsequent litigation.

1    *Helfand v. Gerson*, 105 F.3d 530, 534 (9th Cir. 1997).  The Ninth Circuit has made

2    clear that the doctrine applies to both assertions of fact and arguments about the law.

3    *Id*. at 535 ("The greater weight of federal authority [] supports the position that

4    judicial estoppel applies to a party's stated position, regardless of whether it is an

5    expression of intention, a statement of fact, or a legal assertion.").

6        The Supreme Court has explained that "[t]he circumstances under which

7    judicial estoppel may appropriately be invoked are probably not reducible to any

8    general formula or principle."  *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)

9    (quoting *Allen*, 667 F.2d 1166).  However, the purpose of the doctrine is to "preserve

10   the integrity of the judicial process by preventing a litigant from playing fast and

11   loose with the courts."  *Helfand*, 105 F.3d at 534.  Because the doctrine was created

12   to prevent a party from deliberately manipulating the courts, courts may not apply

13   the doctrine when a party's change in position is based on a mistake, or

14   inadvertence.  *See id*. at 536.  However, when a party takes a contrary position to its

15   former position on a particular issue in order to gain an unfair advantage in the

16   litigation, or to impose an unfair detriment on the opposing party, application of

17   judicial estoppel is appropriate.  *See New Hampshire v. Maine*, 532 U.S. at 751.  A

18   court's use of judicial estoppel is reviewed for abuse of discretion.  *Hamilton v. State*

19   *Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001).

20       Plaintiffs have not responded to the Government's judicial estoppel argument,

21   nor have they explained why they should be permitted to change positions with

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 25

respect to the trust status of MA-8.  While Plaintiffs once asserted that MA-8 was trust land and used the land's trust status as a basis to assert its claims against the BIA, Plaintiffs now maintain that MA-8 is not trust land.  Presently Plaintiffs argue that, because MA-8 is not trust land, the United States should not be a party to this case and has no standing to bring any counterclaims against them.

The Court agrees with the Government's assertion that "Plaintiffs' change in position would remove the United States from the litigation (if the land is not trust land), undercutting the very premise of Plaintiffs' Complaint."  ECF No. 232 at 5. Indeed, Plaintiffs' very first assertion in their Complaint is:

> The [BIA], as an agency of the United States of America [] is responsible for the management and control of Indian allotment lands. The superintendent of the BIA's Colville Indian Agency [], acting as an agent of the United States oversees and manages federal allotment land held in trust for Indian allottees known as Moses Agreement Number 8 ("MA-8").

ECF No. 1 at 2–3.  Moreover, the claims asserted in the Complaint's "Claims for Relief" section are asserted against the BIA for its actions in administering MA-8 as trust land, and the Court already has ruled on these claims.  As a matter of law, Plaintiffs could not have asserted these claims if MA-8 is not held in trust, as Plaintiffs now argue.

Plaintiffs have changed position on this issue in rebutting the Government's

trespass counterclaim.[6]  Plaintiffs began arguing this new, contradictory position

approximately two years after filing their Complaint, and only after their own claims

against the BIA had failed.  The Court finds that by changing position on such a

fundamental issue so late in the litigation, and only after their own claims against the

United States had been resolved, Plaintiffs attempt to gain an unfair advantage and

have played "fast and loose" with this Court.  *See Helfand*, 105 F.3d at 534.  To

protect the integrity of the judicial process, the Court refuses to allow Plaintiffs to

alter their position of a fundamental issue at this point in the litigation and holds that

Plaintiffs are judicially estopped from arguing that MA-8 is not held in trust.

**B. MA-8 is Indian Trust Land**

Given the Court's finding that Plaintiffs are judicially estopped from asserting

the inconsistent position that MA-8 is not trust land, the Court need not decide

whether MA-8 is held in trust to resolve the instant motions.  However, even if

judicial estoppel did not apply here, the Court concludes that MA-8 is trust land.

To determine whether MA-8 remains in trust, the Court has reviewed relevant

statutes, executive orders, regulations, and precedent.  Upon review of these sources,

[6] The Court acknowledges that Plaintiffs also have argued that MA-8 may not be trust land in response to the CTCR's Motion to Dismiss, in order to rebut the CTCR's assertion of sovereign immunity, to postpone hearing on that motion, and to raise "other jurisdictional issues."  *See* ECF No. 223 at 4.

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS FOR SUMMARY JUDGMENT ~ 27

the Court finds that it must interpret certain statutory provisions pertaining to the

Moses Allotments to determine whether MA-8 is trust land.  To engage in this

analysis, it is necessary to evaluate the history and development of the Columbia

Reservation and the Moses Allotments, as well as the historical and legislative

context surrounding the Act of June 15, 1935.  Accordingly, the Court lays out the

relevant history here, as has been described by many courts,[7] beginning with the

creation of the Columbia Reservation, from which the Moses Allotments were

derived.

### *Chief Moses and the ("Moses") Columbia Reservation*

In 1855, the United States entered into the Yakama Nation Treaty, which

created the Yakama Indian Reservation.  *United States v. Oregon*, 787 F. Supp.

1557, 1559 (D. Or. 1992).  Following the ratification of the Yakama Nation Treaty,

the United States tried to remove Indians within the territory ceded by the treaty onto

the Yakama Reservation.  7 Ind. Cl. Comm. at 802 (1959).  However, "There was no

movement as a tribe by either the Chelan, Entiat, Wenatchee or Columbia on to the

Yakima Reservation although individual members of each of the four tribes did

remove to that reservation.  Many of the members of the four tribes continued to live

uninterrupted on their ancestral lands." *Id*.

---

[7] *See e.g., Starr v. Long Jim*, 227 U.S. 613 (1913); *United States v. Oregon*, 787 F. Supp. 1557 (1992).

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 28

After the Yakama Treaty's implementation, the Government understood Chief Moses to be leader of the Columbia. In a 1959 decision, the Indian Claims Commission explained that Chief Moses began leading the Columbia around 1862, and that he subsequently "grew in influence among the [other] Indians of that area." 7 Ind. Cl. Comm. at 802. According to the ICC, Moses's followers "included members of various bands or tribes within the area ceded by the Yakima Treaty including the Chelan, Entiat, and Wenatchee as well as individual Indians from other neighboring tribes." *Id*. The United States recognized Chief Moses as the spokesperson for the Wenatchi, Entiat, Columbia, and Chelan, although not all of them acknowledged Chief Moses as their leader. *United States v. Oregon*, 787 F. Supp. at 1580; *see also* 7 Ind. Cl. Comm. at 802–804 (Government acknowledged Chief Moses as capable of entering into agreement with the Government on behalf of his followers, who were made up of multiple tribes).

In 1879, Chief Moses negotiated directly with the United States to establish a new reservation for his followers. 7 Ind. Cl. Comm. at 802. This resulted in the creation of the Columbia Reservation, or the "Moses Columbia Reservation," by executive order in 1879. *Id*. at 803. The reservation was "withdrawn from sale and set apart as a reservation for the permanent use and occupancy of Chief Moses and his people, and such other friendly Indians as may elect to settle thereon with his consent and that of the Secretary of the Interior." *Id*.; *see* Exec. Order of April 19, 1879, *reprinted in* 1879 Report of the Commissioner of Indian Affairs: Papers

Accompanying.  The Columbia Reservation was established west of the Colville

Reservation, which had been created by executive order just a few years prior.

*United States v. Oregon*, 787 F. Supp. at 1564.

After the Columbia Reservation was set aside, Chief Moses did not live on it,

and many of his followers remained off the reservation as well.  7 Ind. Cl. Comm. at

803; *United States v. Oregon*, 787 F. Supp. at 1563.  In 1883, Chief Moses began

negotiating with the Government again, along with Columbia Chief Sarsarpkin, and

with Chiefs Lot and Tonasket of the Colville Reservation.  Agreement with the

Columbia and Colville, 1883 (ECF No. 305-2 at 17); *United States v. Oregon*, 787

F. Supp. at 1564.  The negotiations culminated in the Agreement with the Columbia

and the Colville of 1883, or the "Moses Agreement."

### *The Moses Agreement*

The Moses Agreement provided for the allotment of individual parcels on the

Columbia Reservation for Indian individuals and families who desired to "remain on

the Columbia Reservation."  ECF No. 305-2 at 17.  Indians residing on the

Columbia Reservation could take an allotment carved from that reservation, or they

could relocate to the Colville Reservation with Chief Moses and the remainder of his

followers.  *Id*. at 17–18.

Congress ratified the 1883 Moses Agreement through the Act of July 4, 1884.

23 stat. 79 (1884) (filed at ECF No. 234-2).  The Act of July 4, 1884 provided that

the Indians residing on the Columbia Reservation with Sarsarpkin (those who had

chosen not to go to the Colville Reservation with Chief Moses) would receive

allotments.  Additionally, it provided that the "remainder" of the Columbia

Reservation would be "restored to the public domain."  *Id*.

On May 1, 1886, President Grover Cleveland issued an executive order to

effectuate the Moses Agreement and the Act of July 4, 1884.  Exec. Order of May 1,

1886, *reprinted in* Report of the Commissioner of Indian Affairs, 1886 Ann. Rep.

Comm'r Off. Ind. Aff. Sec'y Interior 35, 362 (1886).  According to the Annual

Report of the Commissioner of Indian Affairs from 1886, after thirty-seven

allotments were created, the remainder of the Columbia Reservation was restored to

the public domain.  1886 Ann. Rep. Comm'r Off. Ind. Aff. Sec'y Interior 35, 234

(1886).

Indians who did not take allotments on the Columbia Reservation either

relocated to the Colville Reservation or were removed there.  The District Court of

Oregon has described the movement of Indians from the Columbia Reservation after

the Moses Agreement as follows:

> Members of the Wenatchi Tribe were moved to the Colville
> Reservation with funds provided by Congressional Acts in 1902 and
> 1904.  Members of the Columbia and Entiat tribes moved to allotments
> on the Colville reservation, attempting to stay on allotments which fell
> within their traditional areas.  However, the members of the Chelan
> tribe who already resided in areas within the Moses Columbia
> Reservation prior to 1883, and who refused to take allotments on the
> Columbia Reservation under the 1883 Moses Agreement, were moved
> to the Colville Reservation by U.S. military forces in 1890.

*United States v. Oregon*, 787 F. Supp. at 1564.

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 31

1    The Ninth Circuit affirmed the District of Oregon's analysis, finding that the

2    Government "let Moses and his people relocate to the Colville Reservation." *United*

3    *States v. Oregon*, 29 F.3d 481 (9th Cir. 1994).  Similarly, the Indian Claims

4    Commission has found that "Chief Moses and his followers did, in fact, move onto

5    the Colville Reservation and the members of his band or the decedents thereof have

6    continued to reside on the reservation until the present date [of 1959]."  7 Ind. Cl.

7    Comm. at 811.

8              ***Government's Treatment of Moses Allotments***

9    After the Moses Allotments were created, consistent with the Moses

10   Agreement, the Government referred to the allotted land as reservation land, and it

11   associated that reservation land with the Columbia Tribe, the Moses Band of

12   Indians, and/or the Moses Agreement.  For instance, in the BIA's annual reports, the

13   BIA listed the allotments as a "reservation" belonging to the "Moses Band" or set

14   aside by the Moses Agreement.  *See e.g.,* Report of the Commissioner of Indian

15   Affairs, 1907 Ann. Rep. Comm'r Off. Ind. Aff. Sec'y Interior 7, 59 (1907) ("During

16   the last year patents were issued and delivered to Indians, classified by reservations,

17   as follows: . . . Columbia (Moses agreement)."); Report of the Commissioner of

18   Indian Affairs, 1909 Ann. Rep. Comm'r Off. Ind. Aff. Sec'y Interior 1, 140 (1909)

19   (noting that the Columbia reservation was "[U]nder the Colville Agency," belonged

20   to the Columbia (Moses band) "Tribe," and was allotted in its entirety).

21

1    Plaintiffs and Wapato Heritage have argued that the Moses Allotments do not

2  fall within any reservation.  However, if the allotments did not fall within any

3  reservation, the Government would have considered them to be public domain, or

4  homestead allotments.  The Commissioner of Indian Affairs' reports in the

5  nineteenth and early twentieth centuries did not list the Moses Allotments as public

6  domain or homestead allotments.  As explained above, the Government referred to

7  the allotments as a "reservation."  The Government's treatment of the Moses

8  Allotments as "reservation," rather than public domain or homestead, is consistent

9  with the way the Government created the Moses Allotments.  Public domain, or

10  homestead allotments, as the name suggests, were created from land that was on the

11  public domain.  *See* Felix S. Cohen, *Cohen's Handbook of Federal Indian Law*, §

12  16.03[2][e], at 1076 (Nell Jessup Newton et al. eds., 2012) [hereinafter *Cohen's*

13  *Handbook*].

14    As *Cohen's Handbook* explains, the Government allotted "public domain

15  homesteads" to Indians who wanted to acquire land through the Homestead Act, or

16  similar laws, but could not because they were not U.S. citizens at that time.  *Id*.

17  With respect to the Moses Allotments, the Government did not create them from

18  land on the public domain.  Rather, pursuant to the Moses Agreement, the

19  Government sectioned off the Moses Allotments from the Columbia Reservation for

20  individual Indians on that reservation, prior to returning the remainder of the

21  reservation to the public domain.

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 33

1   The BIA administered the Moses Allotments, which it expressly considered to

2   be "reservation" land, from the Colville Agency, on the neighboring Colville

3   Reservation, where Chief Moses and the majority of his followers had settled.  The

4   Government recognized the Moses Band of Indians as living on both the Moses

5   Allotments, and on the Colville Reservation, noting the presence of the Moses Band

6   as an entity on the Colville Reservation as early as 1886.  That year, the Colville

7   Agent noted that "Moses" was a "tribe" "under [his] care," living on the Colville

8   Reservation.  He provided the following description of them:

9           Moses and his people numbering some 200 have during the past year
            fenced in over 400 acres of land and cultivated fully one-half.  They are
10          living on the Nespelim, which is a beautiful valley situated in the
            southern part of the Colville Reserve.  They are industrious, and will in
11          time . . . grow to be a prosperous and self-supporting tribe.

12   Reports of Agents, 1886 Ann. Rep. Comm'r Off. Ind. Aff. Sec'y Interior 35, 231–

13   232 (1886).

14   Additionally, an 1891 map of the State of Washington from the Department of

15   the Interior labels the Moses Allotments as "Indian," and does not distinguish them

16   from the nearby Colville Reservation.  *See* ECF Nos. 316-1–316-3.  The connection

17   that the Government apparently drew between the Moses Allotments and the

18   Colville Reservation is not surprising, given the historical context, and the fact that

19   individuals of the Moses Band resided on the allotments, while the remainder of the

20   entity, including its recognized leader, resided on the Colville Reservation.

21   *//*

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 34

1  ***Trust Patents Issued to Wapato John for MA-8***

2      In 1906, Congress passed the Act of March 8, 1906, which expressly provided

3  for the issuance of trust patents to allottees to receive allotments, as contemplated by

4  the Moses Agreement.  59 Pub. L. 37, 35 stat. 55 (1906) (filed at ECF No. 234-3).

5  Pursuant to the Act, the allotments distributed were to be held in trust for ten years.

6  *Id*.  Unlike allotments issued under the General Allotment Act, trust patents issued

7  consistent with the Act of March 8, 1906 allowed the allottees to sell allotted lands

8  during the trust period, but with the restriction that the allottees were required to

9  keep 80 acres.  *Id*.  In 1907 and 1908, Wapato John received two trust patents for

10  MA-8, having decided not to relocate to the Colville Reservation.  ECF No. 175-1,

11  Ex. E at 24–28; ECF No. 234-25.

12  ***Presidents Wilson and Coolidge Extend Trust Period of MA-8 through
Executive Orders***

13

14      In 1914, President Woodrow Wilson issued an executive order extending the

15  trust period of the allotments created under the Moses Agreement for ten additional

16  years.  Exec. Order 2109 (Dec. 23, 1914) *printed in* Charles J. Kappler, *Indian

17  Affairs Laws and Treaties*, Vol. IV at 1050–51 (filed at ECF No. 234-5 at 1–2). On

18  February 10, 1926, President Calvin Coolidge issued an executive order further

19  extending the period of trust on allotments issued pursuant to the Moses Agreement,

20  that had not already passed out of trust status, for ten years from the date of March 8,

21  1926.  Exec. Order 4382 (Feb. 10, 1926) (filed at ECF No. 234-8 at 1).  Thus, MA-

8's trust status was extended again by executive order, and the trust period would

not expire until March 8, 1936.  *Id.*

### Act of May 20, 1924 Does Not Alter Trust Status of Moses Allotments

In 1924, Congress passed an Act specific to the Moses Allotments, which

permitted the sale and conveyance of an allotment in its entirety with the Secretary

of the Interior's approval.  The Act of May 20, 1924 states as follows:

> *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That any allottee to whom a trust patent has heretofore been or shall hereafter be issued by virtue of the agreement concluded on July 7, 1883, with Chief Moses and other Indians of the Columbia and Colville Reservations, ratified by Congress in the Act of July 4, 1884 . . . may sell and convey any or all the land covered by such patents, or if the allottee is deceased the heirs may sell or convey the land, in accordance with the provisions of the Act of Congress of June 25, 1910 . . . .

68 Pub. L. 122, 43 stat. 133 (1924) (filed at ECF No. 280-1 at 1–2) (emphasis in

original).  This provision references the Act of June 25, 1910, which granted the

Secretary of the Interior authority to make rules and regulations regarding the sale

and conveyance of allotments held in trust.  61 Pub. L. 313, 36 stat. 855 (1910).

Plaintiffs and Wapato Heritage have argued that the Act of May 20, 1924

removes the Moses Allotments from trust status.  The Court uses statutory

interpretation to analyze that argument.  The "first step in interpreting a statute is to

determine whether the language at issue has a plain and unambiguous meaning with

regard to the particular dispute in the case."  *Robinson v. Shell Oil Co.*, 519 U.S.

337, 340 (1997).

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 36

1    Here, the Court need not go further than the first step.  The plain language of

2 the Act of May 20, 1924 does not remove Moses Allotments from trust, return those

3 allotments to the public domain, or issue fee patents to any of the trust patent

4 holders.  Additionally, while the Act provided a mechanism by which the allotments

5 could be sold or conveyed, the Act specifies that any conveyance or sale would need

6 to be done "in accordance with the Provisions of the Act of Congress of June 25,

7 1910."  The express reference to the Act of June 25, 1910 illustrates that the Moses

8 Allotments still were held in trust, as the provisions of that Act applied to Indian

9 allotments held under trust patents.  For these reasons, the Court finds that the statute

10 is unambiguous, and that its enactment did not terminate the trust status of any

11 Moses Allotment.

12            ***End of the Allotment Era and the Indian Reorganization Act***

13        The executive orders that had extended the Moses Allotments' trust period

14 were consistent with shifting federal policy in the early 1900s, which started to

15 recognize the dramatic, negative impact that allotment had on Indian Tribes,

16 families, and individuals.  "By the 1920s, federal officials acknowledged that the

17 allotment policy had not only failed to serve any beneficial purpose for Indians, but

18 had been terribly harmful."  *Cohen's Handbook*, § 16.03[2][c], at 1074; *see also*

19 William C. Canby, Jr., *American Indian Law in a Nutshell* 23–25 (6th ed. 2014)

20 [hereinafter *Canby*].  Between 1887 (the passage of the General Allotment Act) and

21 the end of the allotment period in 1934, Indian land holdings were reduced from 138

1    million acres to 48 million acres.  *Canby* at 23.  Thus, "The executive branch and

2    Congress began extending trust periods on most allotments . . . ."  *Cohen's*

3    *Handbook*, § 16.03[2][c], at 1074.

4        In 1934, Congress ended the nation's allotment policy through the Indian

5    Reorganization Act ("IRA").  *Id.*  (explaining that the IRA "officially ended the

6    policy of allotting tribal holdings").  The IRA "prohibited any further allotment of

7    tribal land, provided that allotments then held in trust would continue in trust until

8    Congress provided otherwise, and authorized the Secretary of the Interior to take

9    lands into trust for tribes and tribal members."  *Id.*  Accordingly, the trust period on

10   the Indian lands covered by the IRA was extended indefinitely.

11       However, the IRA did not apply to "any reservation wherein a majority of the

12   adult Indians . . . [voted] against its application."  25 U.S.C. § 5125.  Due to the

13   language of this exemption, the Commissioner of Indian Affairs, John Collier,

14   became concerned that the IRA's indefinite trust period extension would not apply

15   to Indian land reserved for tribes that voted against the IRA.  *See* ECF No. 329 at 14

16   (Court's prior Order citing Collier's statements to the House Committee on Indian

17   Affairs).  As one of the IRA's core purposes was to prevent Indian trust land from

18   falling into non-Indian hands, Collier drafted an amendment to the IRA, to solve this

19   problem.  *Id.*; *see Stevens v. C.I.R.*, 452 F.2d 741, 748 (9th Cir. 1971) (explaining

20   that "[o]ne of the purposes of the Reorganization Act was to put an end to the

21   allotment system which had resulted in a serious diminution of Indian land base").

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 38

The amendment was adopted by Congress in the Act of June 15, 1935, and provided in relevant part:

> If the period of trust or of restriction on any Indian land has not, before the passage of this Act, been extended to a date subsequent to December 31, 1936, and if the reservation containing such lands has voted or shall vote to exclude itself from the application of the [IRA], the periods of trust or the restrictions on alienation of such lands are hereby extended to December 31, 1936.

Act of June 15, 1935, 74 Pub. L. 147, 49 stat. 378 (1935) (filed at ECF No. 234-10). Therefore, the period of trust "on any Indian land" was extended to December 31, 1936 if: (1) the trust period was set to expire prior to that date, and (2) "the reservation containing" the Indian land had voted to exclude itself from the application of the IRA, or would vote to do so by the deadline of June 18, 1936. *Id*.

In 1935, a vote was held on the Colville Reservation, which was made up of many tribes, including the "Moses" Indians who resided there due to the Moses Agreement. The tribes of the Colville Reservation voted against the application of the IRA, and soon after formed the Confederated Tribes of the Colville Reservation. The Moses-Columbia are members of the Confederated Tribes.

### *Application of the Act of June 15, 1935 to the Moses Allotments*

It is disputed whether the Act of June 15, 1935 extended the trust period of the Moses Allotments. Plaintiffs and Wapato Heritage argue that the statute does not apply and, as such, the Moses Allotments fell out of trust on March 8, 1936, the expiration date set by the last executive order extending their trust period.

1    The Court must engage in statutory interpretation to decide if the Act of June

2    15, 1935 applies to the Moses Allotments, including MA-8.  When courts interpret a

3    statute, if "the statutory language provide[s] a clear answer," then the court's task

4    "comes to an end."  *Woods v. Carey*, 722 F.3d 1177, 1180–81 (9th Cir. 2013)

5    (quoting *United States v. Harrell*, 637 F.3d 1008, 1010 (9th Cir. 2011) (citation

6    omitted)).  However, when "the statute's terms are ambiguous, [] [the court] may use

7    canons of construction, legislative history, and the statute's overall purpose to

8    illuminate Congress's intent."  *Id*. at 1181 (quoting *Jonah v. Carmona*, 446 F.3d

9    1000, 1005 (9th Cir. 2006)).  "A statute is ambiguous if it 'gives rise to more than

10   one reasonable interpretation.'"  *Id*. (quoting *DeGeorge v. U.S. Dist. Ct. for Cent.*

11   *Dist. of Cal.*, 219 F.3d 930, 939 (9th Cir. 2000) (citation omitted)).  "The purpose of

12   statutory construction is to discern the intent of Congress in enacting a particular

13   statute."  *Pacific Coast Federation of Fishermen's Associations v. Glaser*, 945 F. 3d

14   1076, 1083 (9th Cir. 2019) (quoting *Robinson v. United States*, 586 F.3d 683, 686

15   (9th Cir. 2009) (citation omitted)).

16   Additionally, while the standard principles of statutory construction apply

17   here, the Supreme Court has explained that they "do not have their usual force in

18   cases involving Indian law."  *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759,

19   766 (1985).  "The canons of construction applicable in Indian law are rooted in the

20   unique trust relationship between the United States and the Indians."  *Id*. (quoting

21   *Oneida Cty. v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985)).  One relevant

Indian law canon of construction is that "statutes are to be construed liberally in

favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.*

(citing *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 174 (1973); *Choate v.*

*Trapp*, 224 U.S. 665, 675 (1912)).

The Court begins with the language of the statute. The statute's trust

extension applies to the broad category of "any Indian land" that satisfies the

statute's two conditions. Neither the statute itself nor the IRA provides a definition

of the term "Indian land."[8] However, the Government clearly considered the Moses

Allotments to be "Indian land" in 1935. At that time, the Moses Allotments were

recognized as Indian "reservation" land by the Government, were associated with

the Moses Band of Indians, were administered from the Colville Agency, and were

held in trust for the Indian allottees. Additionally, the Moses Allotments' trust

period had been extended by two executive orders. Thus, on its face, the broad

---

[8] The IRA, which the 1935 Act amended, did not apply to "Indian holdings of allotments or homesteads upon the public domain outside the geographic boundaries of any Indian reservation . . . ." 25 U.S.C. §5111. One could argue that this restriction on the IRA's applicability should be used to inform the 1935 Act's use of the term "Indian Land," limiting the term's definition to exclude public domain, or homestead allotments located outside the geographic boundaries of a reservation. Even accepting that argument, for reasons this Court already has explained, the Moses Allotments were reservation allotments, not "holdings of allotments or homesteads upon the public domain." Accordingly, this provision does not help answer the question of whether the 1935 Act applies to the Moses Allotments.

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 41

statutory phrase "any Indian land" contemplates reservation allotments such as the

Moses Allotments.

Next, the Court turns to the two conditions that the "Indian land" must meet

for the Act's trust period extension to apply.  Pursuant to the Act, the trust period on

"any Indian land" was extended if:

> (1) "the period of trust or restriction . . . ha[d] not, before the passage of th[e] Act, been extended to a date subsequent to December 31, 1936," and
>
> (2) "if the reservation containing such lands ha[d] voted . . . to exclude itself from the application of the [IRA]."

Act of June 15, 1935, 74 Pub. L. 147, 49 stat. 378 (1935) (filed at ECF No. 234-10).

With respect to the first condition, the Moses Allotments' trust period would

have expired on March 8, 1936, pursuant to President Coolidge's 1926 executive

order.  Thus, the first condition is applicable to the Moses Allotments; the trust

period on the Moses Allotments would have expired prior to December 31, 1936.

The Court now turns to the language of the second condition, which states that

the trust period on any Indian lands will be extended "if the reservation containing

such lands has voted . . . to exclude itself from the application of the [IRA]."  Read

in context with the remainder of the statute, the condition that the "reservation

containing" Indian land must "vote[]" implies that "any Indian land" would have

been "contain[ed]" by a reservation with a form of tribal entity that had the power to

1  vote on the IRA's applicability.  However, that is not the case with respect to the

2  Moses Allotments, given their unique history.

3        While the U.S. Government consistently acknowledged the Moses Allotments

4  as "Moses Band" reservation or "Columbia" reservation land, it is also clear that the

5  land was made up entirely of reservation allotments; the rest of the Columbia

6  Reservation had been restored to the public domain long before Congress passed the

7  IRA or the 1935 Act.  By nature of being allotted land, the Moses Allotments were

8  held in trust for individuals.

9        Moreover, the band with which the Government associated those individual

10 allottees resided on the Colville Reservation.  While the Tribes on the Colville

11 Reservation voted against the application of the IRA, it appears that the Secretary of

12 the Interior did not facilitate any vote on the Moses Allotments, in which the

13 allottees could vote separately regarding the trust status of those reservation

14 allotments in particular.

15       Wapato Heritage argues that the plain language of the statute cannot apply to

16 the Moses Allotments because the Moses Allotments are not geographically

17 "contain[ed]" by a reservation that voted to exclude itself from the IRA.  Similarly,

18 Wapato Heritage further maintains that, to the extent that the Colville Tribes voted

19 to exclude themselves from the IRA, that vote does not apply to the Moses

20 Allotments because the allotments are not geographically "contain[ed]" by the

21 Colville Reservation.

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 43

On the other hand, the CTCR maintain that the Colville Tribes' vote to exclude themselves from the IRA extends to the Moses Allotments, because the allottees living on the Moses Allotments were members of the Colville Tribes and would have voted with the Colville Tribes.  The CTCR explain:

> MCR [Moses Columbia Reservation] allotment Indians were and are members of the Colville Tribe and were so enrolled at the time of the IRA and the 1935 Act.  []  Because the MCR allotments are reservation and the Colville Tribes voted against the IRA, the 1935 Act's trust extension applies.

ECF No. 316 at 2–3.  The CTCR have provided documentation showing that at least some of the Indians on the Moses Allotments enrolled in the Colville Tribes prior to the Colville IRA vote in 1935.  *See* ECF No. 316-4.

Due to the complex history surrounding the Moses Allotments, the Court finds that it is unclear from the language of the 1935 Act whether the trust extension would have applied to reservation allotments like the Moses Allotments, where: (1) the only reservation land remaining was allotted to individual Indians, and (2) the tribal entity with which the Government associated those individual Indians lived on a separate reservation, and would have voted on the IRA's applicability on that separate reservation.  In light of the parties' competing interpretations of the 1935 Act's language, and the lack of guidance or definitions provided by the text of the statute, the Court finds that the statute is ambiguous.

1    When a statute's language is ambiguous, the court may turn to canons of

2    construction, the legislative history, and the statute's overall purpose, to determine

3    what Congress intended when it passed the statute. *Woods*, 722 F.3d at 1180–81.

4        The Court begins with the relevant Indian law canon of construction, requiring

5    that "statutes [] be construed liberally in favor of the Indians, with ambiguous

6    provisions interpreted to their benefit." *See Montana v. Blackfeet Tribe of Indians*,

7    471 U.S. at 766.  This canon supports the CTCR's and the Government's liberal

8    reading of the statute because that reading results in the preservation of the Moses

9    Allotments' trust status.  No court ever has found that Indian land losing its trust

10    status, thus becoming taxable, freely alienable to non-Indians, and otherwise losing

11    its status as Indian land, is beneficial to the Indians.  That idea would run contrary to

12    the trust relationship, and the canon itself.

13        Moreover, in this case, many of the allottee Defendants have submitted signed

14    statements which uniformly maintain: "The MA-8 Allottees affirm and support the

15    9th Cir. 2011 decision in Wapato Heritage, LLC v. United States, that the MA-8

16    Master Lease expired in 2009 and that the 'United States holds MA-8 in trust.'"

17    *See, e.g.,* ECF No. 475.  The Indian law canon of construction requiring the Court to

18    liberally construe statutes in favor of the Indians demands finding that the 1935 Act

19    applies to the Moses Allotments.

20        However, out of an abundance of caution, the Court also has considered the

21    legislative history and overall purpose of the 1935 Act, to determine whether

Congress intended reservation allotments like the Moses Allotments to be excluded

from the Act's trust period extension.  Prior to the 1935 Act, Mr. Collier,

Commissioner of Indian Affairs, addressed the House Committee on Indian Affairs

regarding the purpose of the Act.  He explained the importance of keeping Indian

land in trust so that it would not be alienated to non-Indians, through voluntary or

forced sale.  On behalf of the BIA, Mr. Collier testified in favor of the 1935 Act,

stating:

> Our view is that the Indian lands should remain tax exempt for a good while; I do not say that they should remain so forever, but for a long time to come the Indian lands should remain tax exempt and the Government should continue to render useful services to the Indian. The Government should provide schools, health facilities, and so forth, for them.
>
> We believe that insofar as practicable control of Indian property should be given to the Indians.  We shall continue to seek to do that.
>
> We do not, however, wish to see the trust period terminated because, first, they then face taxation and in the second place, it means power to alienate.  We believe that the destiny of the Indian is a destiny on his land and that he ought to keep it.

ECF No. 313-2 at 2.

As Mr. Collier testified, maintaining trust status on Indian lands was

imperative because, without it, land could be sold voluntarily to non-Indians, further

reducing Indian landholdings across the United States.  Additionally, as Mr. Collier

explained, non-trust land was subject to taxation.  Frequently, Indians who could not

afford to pay taxes on their allotments would lose them, either through voluntary or

1  forced sale.  *See Chase v. McMasters*, 573 F.2d 1011, 1016 (8th Cir. 1978) (citing

2  78 Cong. Rec. 11726 (1934) (remarks of Rep. Howard)).

3  In addition to promoting tribal self-governance, protecting the trust status of

4  Indian land was a primary purpose of the IRA, which the 1935 Act amended.  As

5  described *supra*, the IRA famously ended the allotment era and extended the trust

6  period on a vast amount of Indian land indefinitely.  *See* 25 U.S.C. §§ 5101 and

7  5102.  Provisions of the IRA that protected Indian trust land were "[p]erhaps the

8  most important and effective provision[s] of the Indian Reorganization Act."  *See*

9  *Canby* at 26.

10  The 1935 Act, when read in conjunction with the IRA, provided further

11  reassurance that Indian land would not fall out of trust.  Indeed, the 1935 Act served

12  as a gap-filler, ensuring that, even if Indians voted against the IRA, the trust status of

13  their land would be protected at least until December 31, 1936.  It was the BIA's

14  contemporaneous view that the 1935 Act extended the trust period on "all Indian

15  lands outside of Oklahoma which would have otherwise expired" prior to December

16  31, 1936.  ECF No. 307-4 at 5.

17  Nothing in the legislative history suggests that Congress intended to exclude

18  reservation allotments such as the Moses Allotments from the trust period extension

19  provided by the 1935 Act due to the fact that the allotments were not geographically

20  "containe[ed]," or bounded, by the voting reservation.  Moreover, to find that the

21  Moses Allotments should be excluded from the trust period extension would run

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 47

contrary to one of the fundamental purposes of the 1935 Act and the IRA, which was to protect and continue the trust status of "any Indian land."  Thus, the legislative history and overall purpose of the statute support the CTCR's broader reading of the 1935 Act.

Notably, the CTCR's reading also comports with the BIA's interpretation, as issued in an Appendix to the 1949 Code of Federal Regulations.  While it appears that the Secretary of the Interior did not hold a vote on the Moses Allotments specifically, the BIA concluded in an Appendix to the Code of Federal Regulations that the "Chief Moses Band" Reservation, comprised of the Moses Allotments, was a "reservation . . . not subject to the benefits of such indefinite trust or restricted period extension" provided by the IRA.  LIST OF FORMS, 25 CFR 1949 367–70 (Appendix—Extension of the Trust or Restricted Status of Certain Indian Lands) (filed at ECF No. 307-5 at 4).  The BIA further concluded that the 1935 Act applied to the Chief Moses Band Reservation, thus extending the trust period to December 31, 1936. *Id.*

Ever since the BIA issued trust patents for the Moses Allotments, the BIA has treated the Moses Allotments as trust land, and Congress has not interfered. Congress has even ratified the trust status of MA-8.  Indeed, Congress acknowledged that MA-8 is trust land as recently as 2006, when it amended the Indian Long-Term Leasing Act to add MA-8 to the list of Indian trust lands that could be leased by their owners for 99 years.  Act of May 12, 2006, 109 Pub. L. 229,

120 Stat. 340 (2006).  Congress ratifies an agency's interpretation or practice when it is aware of that interpretation or practice, legislates in an area covered by that interpretation or practice, and does not refer to or change that interpretation or practice.  *See San Huan New Materials High Tech v. ITC*, 161 F.3d 1347 (9th Cir. 1999); *see also Stratman v. Leisnoi, Inc.*, 545 F.3d 1161, 1171–72 (9th Cir. 2008). "[A]bsent some special circumstance [Congress's] failure to change or refer to [an agency's] existing practices is reasonably viewed as ratification thereof."  161 F.3d 1347 (9th Cir. 1999).  Since the passage of the 1934 Act, the Executive and Congress continually have treated MA-8 as trust land.

For the foregoing reasons, the Court finds that the legislative history and overall purpose of the 1935 Act and the IRA, which the Act amended, reflect Congress's clear intent to preserve the trust status of any reservation land, including reservation allotments like the Moses Allotments.  To the extent that there is any doubt that MA-8 remains in trust, Congress ratified the BIA's treatment of MA-8 as Indian trust land as recently as 2006.

### Post-1935 Trust Period Extensions

Since the 1935 Act, the trust period for the Moses Allotments has been extended periodically through the present day.  *See* Exec. Order 7464 (Sept. 30, 1936) printed in Charles J. Kappler, Indian Affairs Laws and Treaties, Vol. V at 643) (filed at ECF No. 234-11); Appendix—Extension of the Trust or Restricted Status of Certain Indian Lands, 25 Fed. Reg. 13688–89 (Dec. 24, 1960) (filed at

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS FOR SUMMARY JUDGMENT ~ 49

ECF No. 234-13); Appendix—Extension of the Trust or Restricted Status of Certain Indian Lands, 28 Fed. Reg. 11630-31 (Oct. 31, 1963) (filed at ECF No. 234-14); Appendix—Extension of the Trust or Restricted Status of Certain Indian Lands, 33 Fed. Reg. 15067 (Oct. 9, 1968) (filed at ECF No. 234-15); Appendix—Extension of the Trust or Restricted Status of Certain Indian Lands, 38 Fed. Reg. 33463–64 (Dec. 14, 1973) (filed at 234-16); Appendix—Extension of the Trust or Restricted Status of Certain Indian Lands, 43 Fed. Reg. 58368–69 (Dec. 14, 1978) (filed at ECF No. 234-17); Extension of the Trust or Restricted Status of Certain Indian Lands, 48 Fed. Re. 34026 (July 27, 1983) (filed at ECF No. 234-18); Extension of the Trust or Restricted Status of Certain Indian Lands, 53 Fed. Reg. 30673–74 (Aug. 15, 1988) (filed at ECF No. 234-19). Most recently, Congress enacted legislation that comprehensively extended the trust period indefinitely for "all lands held in trust by the United States for Indians." 25 U.S.C. §5126.

The Court concludes that MA-8 is Indian land held in trust by the United States for the benefit of the allottees. Accordingly, the Court rejects Plaintiffs' and Wapato Heritage's argument that the Government lacks standing to assert a trespass counterclaim against Plaintiffs.

## II. Plaintiffs' Motion for Default Judgment against Certain Individual Allottee Defendants

Plaintiffs have moved for default judgment against certain, non-appearing allottee Defendants. Obtaining a default judgment is a two-step process. *See* Fed.

1    R. Civ. P. 55.  First, "when a party against whom a judgment for affirmative relief is

2    sought has failed to plead or otherwise defend . . . the clerk must enter the party's

3    default." Fed. R. Civ. P. 55(a).  Second, once the clerk has entered default against a

4    party, the moving party may seek default judgment.  *See* Fed. R. Civ. P. 55(b).  Once

5    the clerk enters default against a party, the well-pleaded allegations of the complaint

6    are taken as true, except for allegations related to damages.  *See Geddes v. United*

7    *Financial Group*, 559 F.2d 557, 560 (9th Cir. 1977).  The decision to grant default

8    judgment lies within the discretion of the trial court.  *PepsiCo. Inc. v. Cal Sec. Cans*,

9    283 F. Supp.2d 1172, 1174 (C.D. Cal. 2002) (citing *Draper v. Coombs*, 792 F.2d

10   915, 924–25 (9th Cir. 1986)).

11       Generally, "default judgments are disfavored; cases should be decided upon

12   their merits whenever reasonably possible." *Westchester Fire Ins. Co. v. Mendez*,

13   585 F.3d 1183, 1189 (9th Cir. 2009).  In deciding whether default judgment is

14   appropriate, district courts consider the following factors:

15       (1) The possibility of prejudice to the plaintiff;

16       (2) The merits of the plaintiff's substantive claim;

17       (3) The sufficiency of the complaint;

18       (4) The sum of money at stake in the action;

19       (5) The possibility of a dispute concerning material facts;

20       (6)  Whether the default was due to excusable neglect; and

21       (7)  The strong public policy underlying the Federal Rules of Civil Procedure

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 51

favoring decision on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).  While the Ninth Circuit

has instructed district courts to consider these factors when exercising their

discretion, courts may not grant default judgment against a defendant if the

plaintiff's claims are legally insufficient.  *See Cripps v. Life Ins. Co. of North

America*, 980 F.2d 1261, 1267 (9th Cir. 1992) (explaining that "claims which are

legally insufficient [] are not established by default").

**A. Equitable Estoppel as an Independent Cause of Action**

The Government and the CTCR have argued that Plaintiffs' estoppel claim

against the individual allottee Defendants is not legally cognizable under

Washington law.[9]  They argue that equitable estoppel is only cognizable as a

defense, not as a cause of action.  Accordingly, they maintain that default judgment

is inappropriate here because Plaintiffs' claim against the allottees is legally

insufficient.  Plaintiffs respond that under Washington law they may assert equitable

estoppel as a cause of action, not just as a defense.  The Court assumes *arguendo*,

---

[9] There is also a dispute as to whether Washington law applies to Plaintiffs' claim
against the individual allottees.  *See* ECF No. 469 at 12.  Because the Court's
decision regarding Plaintiffs' claim against the individual allottees does not depend
on resolving that issue, the Court assumes for the purposes of this Order, without
finding, that Plaintiffs may assert a state law claim against the individual allottee
Defendants.

1  without finding, that Washington law may be applied against the allottees in this

2  case.

3        At one time, it was an open question under Washington law as to whether a

4  plaintiff could assert equitable estoppel as an affirmative cause of action.  The

5  Washington State Supreme Court left the possibility open in *Chemical Bank v.*

6  *Washington Public Power Supply System*, refusing to rule on the issue.  691 P.2d

7  524, 541 (Wash. 1984); *see also DigiDeal Corp. v. Kuhn*, No. 2:14-CV-227-JLQ,

8  2015 WL 5477819, at *3 (E.D. Wash. Sept., 6, 2015) (explaining after a

9  consideration of Washington law that "the court cannot say equitable estoppel fails

10 as an independent cause of action").  However, since then, Washington case law has

11 developed, and now it is clear that equitable estoppel may not be asserted as an

12 affirmative cause of action; in other words, equitable estoppel must be used as a

13 "shield," not a "sword."  *Sloma v. Wash. State Dep't. of Retirement Systems*, 459

14 P.3d 396, 406 (Wash. Ct. App. 2020) ("More importantly, equitable estoppel is not

15 available for use as a "sword," or cause of action."); *Byrd v. Pierce Cty.*, 425 P.3d

16 948, 952–55 (Wash. Ct. App. 2018) (discussing cases and explaining that equitable

17 estoppel is a defense, not a separate action in equity) (citing *Motely-Motley, Inc. v.*

18 *State*, 110 P.3d 812, 818 (Wash. Ct. App. 2005)).

19        Plaintiffs argue that they are not using their cause of action affirmatively, or as

20 a "sword," against the individual allottees.  They maintain, "Plaintiffs seek a

21 defensive application—to estop the Allottees from taking a position inconsistent

1   with their prior acts and omissions—like that endorsed [by Washington courts]."

2   ECF No. 483 at 9.  Plaintiffs argue that their cause of action is "defensive" because

3   it does not "compel the allottees to do anything."  *Id*.  This argument makes little

4   sense.  The individual allottees have not asserted any counterclaims against

5   Plaintiffs.  With respect to the individual allottee Defendants, Plaintiffs have nothing

6   against which to defend.  They have no use for a shield.

7       Recent Washington precedent is clear that equitable estoppel is not a legally

8   cognizable cause of action.  *Sloma*, 459 P.3d at 406; *Byrd*, 425 P.3d at 952–955.

9   Accordingly, even assuming *arguendo* that Washington law applies, Plaintiffs'

10  Motion for Default Judgment is denied for failure to plead a cognizable claim

11  against the defaulting Defendants.

12  **B. *Eitel* Factors**

13      Moreover, even if Plaintiffs' claim were legally cognizable, the *Eitel* factors

14  weigh heavily against granting Plaintiffs' Motion for Default Judgment.  With

15  respect to the first *Eitel* factor, Plaintiffs have not adequately explained the prejudice

16  that they will encounter if the Court refuses to enter default judgment.  Other

17  similarly situated individual allottee Defendants have appeared in this action, and the

18  case is proceeding on the merits with respect to those Defendants.  Additionally, as

19  Plaintiffs have put it, their equitable estoppel claim does not "compel the allottees to

20  do anything."  Therefore, it is not clear that Plaintiffs will suffer any prejudice if the

21

1  Court refuses to grant their Motion for Default Judgment.  Accordingly, the first

2  *Eitel* factor weighs against entering default judgment.

3        Similarly, the fifth *Eitel* factor, which considers the possibility of a dispute

4  concerning material facts, weighs against granting Plaintiffs' Motion for Default

5  Judgment.  Again, other similarly situated Defendants have appeared to defend this

6  case.  Because some allottees have appeared to defend against Plaintiff's estoppel

7  claim, there is a possibility of dispute concerning material facts.

8        The sixth *Eitel* factor also weighs against entry of default judgment, as the

9  individual allottees' failure to appear in this case constitutes excusable neglect.  The

10  Government holds MA-8 in trust for the allottees.  Several of the defaulting allottees

11  have signed and submitted a form response to the instant motion, which states that

12  they did not appear in this action because they understood the United States to

13  represent their collective interest in MA-8.  The form response appears to have been

14  circulated by allottee Defendants Marlene Marcellay, Darlene Marcellay-Hyland,

15  and Maureen Marcellay to the remaining MA-8 allottees.  *See* ECF Nos. 475–480.

16  That response states:

17         The MA-8 Allottees assert that many of the MA-8 Allottees assumed
       their interest and representation in the MA-8 legal proceedings were

18         being managed by the BIA as "trustee" to the MA-8 Allottees, and
       therefore, did not respond to court proceedings resulting in default []

19         against non-appearing MA-8 allottees/defendants.  The non-appearing
       Allottees identified by the Court, and who have signed this document,

20         now wish to affirm and assert their support of the declaration contained
       in this document . . . .

21

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 55

1    *See* ECF Nos. 475–80.  Because MA-8 is trust land, the Court finds that the MA-8

2    allottees may have reasonably believed that they did not need to respond to

3    Plaintiffs' Complaint after the Government had appeared in its trust capacity.

4    Therefore, the sixth *Eitel* factor weighs against entry of default judgment.

5          Finally, for the reasons explained above, the seventh *Eitel* Factor, which

6    considers the strong public policy underlying the Federal Rules of Civil Procedure

7    favoring decisions on the merits, weighs against entering default judgment.  Upon

8    consideration of the *Eitel* factors, the Court finds that default Judgment is not

9    appropriate, even if Plaintiffs' claim against the defaulting Defendants were legally

10    cognizable, which it is not.

11    **III.    Plaintiffs' Motion for Summary Judgment against Certain Individual**

12            **Allottees**

13          Plaintiffs have moved for summary judgment against nine allottee Defendants

14    who did not respond to Plaintiffs' requests for admission ("RFAs").  They argue

15    that, pursuant to Federal Rule of Civil Procedure 36(a)(3), the non-responding

16    allottee Defendants have admitted to the matters contained in the RFAs by failing to

17    respond.  Therefore, Plaintiffs assert that the non-responding Defendants have

18    admitted facts proving that those Defendants are "equitably, collaterally, or

19    otherwise estopped from denying the Plaintiffs their right to occupy and use the Mill

20    Bay Resort until February 2, 2034."  ECF No. 439 at 2.

21

1          A court may grant summary judgment where "there is no genuine dispute as

2   to any material fact" of a party's prima facie case, and the moving party is entitled to

3   judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*,

4   477 U.S. 317, 322–23 (1986).  When the moving party will have the burden of proof

5   at trial, she must demonstrate on summary judgment that no reasonable trier of fact

6   could find other than for her.  *Ryan v. Zemanian*, 584 Fed. App'x. 406, 406 (9th Cir.

7   2014) (citing *Celotex Corp.*, 477 U.S. at 232).

8          As explained above, assuming *arguendo* that state law applies to Plaintiffs'

9   claims against the individual allottee Defendants, Plaintiffs' estoppel claim is not

10  legally cognizable because equitable estoppel is not an affirmative cause of action

11  under Washington law.  *Sloma*, 459 P.3d at 406; *Byrd*, 425 P.3d at 952–955.

12  Therefore, Plaintiffs are not entitled to judgment as a matter of law on that claim.

13  Plaintiffs' motion for summary judgment fails for that reason alone.

14         However, even if the claim were valid under Washington law, the Court finds

15  that Plaintiffs' RFAs were untimely, and thus cannot support Plaintiffs' motion for

16  summary judgment.  *See* ECF No. 272 at 2 (Scheduling Order); *see also Baxter*

17  *Bailey & Associates v. Ready Pac Foods, Inc.*, Case No. CV 18-08246 AB (GJSx),

18  2020 WL 1625257, at *1 (C.D. Cal. Feb. 26, 2020) (explaining that Defendants were

19  not obligated to respond to untimely discovery requests, and their failure to respond

20  could not be used by Plaintiffs to create an issue of material fact precluding

21  summary judgment); *Dinkins v. Bunge Mill., Inc.*, 313 Fed. Appx. 882, 884 (7th Cir.

2009) (finding that a party need not respond to requests for admission when "the requests for admissions were mailed only nine days before the close of discovery"). Defendants did not have an obligation to respond to untimely discovery requests. *See id*.

Plaintiffs argue that, pursuant to this Court's prior Scheduling Order, their RFAs were timely. The Scheduling Order at ECF No. 272 established deadlines for discovery related to the Government's Motion for Summary Judgment re Ejectment only. Plaintiffs contend that their RFAs were not propounded for the purpose of responding to the Government's Motion for Summary Judgment re Ejectment. However, Plaintiffs' own briefing belies that claim. For example, Plaintiffs' instant Motion for Summary Judgment, which relies entirely on the unanswered RFAs, asserts, "At the very least, the Allottees' admissions create issue of fact precluding the MSJ re ejectment." ECF No. 483 at 8 and 9.

Moreover, Plaintiffs' Motion for Summary Judgment, based upon the unanswered RFAs, was submitted on the parties' deadline to file supplemental briefing related to the Government's Motion for Summary Judgment re Ejectment. Considering the briefing, the record, and the nature of the remaining claims, the purpose of the RFAs appears to be an attempt to create issues of material fact precluding the Government's Motion for Summary Judgment re Ejectment. Therefore, the Court finds that the RFAs are discovery related to the Government's

Motion for Summary Judgment re Ejectment, filed in 2012, which is governed by this Court's prior Scheduling Order.

The Court's Scheduling Order required Plaintiffs to serve RFAs "sufficiently early that all responses [were] due before the discovery deadline" of November 1, 2012.  ECF No. 272 at 2.  Because Plaintiffs served the RFAs via mail on October 1, 2012, and because November 3, 2012 was a Saturday, the responses would have been due on November 5, 2012.  *See* Fed. R. Civ. P. 6(a)(2) and (d); ECF No. 296-1 at 59–60.  Accordingly, the RFAs were untimely and cannot be used now against the non-answering allottee Defendants.

Finally, even if (1) the Court deemed the unanswered RFAs admitted, which it does not, and (2) found that equitable estoppel was a viable affirmative cause of action under Washington law, which it does not, Plaintiffs' Motion for Summary Judgment on its equitable estoppel claim still fails.  Pursuant to Washington law, the elements of equitable estoppel are:

> (1) a party's admission, statement, or act inconsistent with its later claim;
>
> (2) action by another party in reliance on the first party's act, statement or omission; and
>
> (3) injury that would result to the relying party from allowing the first party to contradict or repudiate the prior act, statement or omission.

*Kramarevicky v. Dep't of Soc. & Health Servs.*, 863 P.2d 535, 538 (1993).

1    The Court finds that the RFAs, even if deemed admitted, do not support the

2    third prong of an equitable estoppel claim, nor does any other evidence on the

3    record.  Specifically, the unanswered RFAs do not support the contention that

4    "injury will result" to Plaintiffs if the non-responding allottees are permitted to

5    "contradict or repudiate the prior act, statement, or omission."  *See id*.  Plaintiffs

6    assert, "[I]t is undisputed that Plaintiffs will be injured if Non-Responding Allottees

7    are permitted now to deny Plaintiffs the right to occupy MA-8 until 2034 . . . ."

8    However, Plaintiffs have not connected the dots with reasoning, law, or evidence.  It

9    is not clear how nine individual allottees could approve or deny Plaintiffs' use of

10   MA-8, such that their positions would have any impact on the outcome of this case,

11   when there are many more allottees involved, as well as the Federal Defendants.

12   As explained in greater detail below, because MA-8 is Indian trust land, use of

13   MA-8 is governed by extensive federal regulations.  Pursuant to those regulations,

14   the Government generally may remove trespassers from fractionated allotments

15   without first obtaining majority consent from the allottees.  While there are

16   regulations in place to protect allottee interests, in this case, whether nine individual

17   allottees support the Government's treatment of Plaintiffs as trespassers is not

18   causally connected to the Plaintiffs' alleged harm: removal from MA-8 by the

19   Government.  Put another way, even if the Court granted Plaintiffs' motion, thus

20   forbidding the non-responding Indian allottees from challenging Plaintiffs' use of

21

their land for the next fourteen years, the Government still could seek the ejectment of Plaintiffs in its role as trustee.

Accordingly, Plaintiffs have not provided any evidence to support the third prong of estoppel against the allottees, specifically that injury will result if the Court refuses to estop the non-responding allottees. Therefore, even accepting *arguendo* the premise of Plaintiffs' Motion for Summary Judgment, Plaintiffs are not entitled to judgment as a matter of law on their estoppel claim against the non-responding allottee Defendants.

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is denied.

**IV.    Defendants' Motion for Summary Judgment re Ejectment**

The Government has asserted a counterclaim of trespass against Plaintiffs and renewed their motion for summary judgment on that claim, thereby seeking ejectment of Plaintiffs from MA-8. As this Court already has explained, Federal common law allows the Government to bring this trespass claim, acting in its sovereign capacity as trustee, to remove trespassers from Indian land. *See United States v. Pend Oreille Pub. Util. Dist. No. 1*, 28 F.3d 1544, 1549 n.8 (9th Cir. 1994).

**A. Consent of Allottees**

Plaintiffs argue that the Government has "no authority to eject Plaintiffs from the property absent the express consent of a majority of the Allottees—*which is now impossible to obtain*." ECF No. 438 at 12 (emphasis in original). First, the Court

notes that Plaintiffs do not explain why it is now impossible for the Government to obtain consent of the landowners.  However, more importantly, Plaintiffs cite absolutely no authority for their assertion that the Government must receive "express consent" from a majority of MA-8 allottees to proceed with this action, which seeks to eject an individual and a Washington State nonprofit corporation from Indian trust land.

The CTCR's briefing, on the other hand, directs the Court to relevant law, citing regulations that govern the BIA's management of leases on allotted land. Specifically, the CTCR cite 25 C.F.R. § 162.023, which describes what the BIA will do when an individual or entity takes possession or use of Indian land, without a valid lease:

> If an individual or entity takes possession of, or uses, Indian land without a lease and a lease is required, the unauthorized possession or use is a trespass.  We may take action to recover possession, including eviction, on behalf of the Indian landowners and pursue any additional remedies available under applicable law.  The Indian landowners may pursue any available remedies under applicable law.

25 C.F.R. § 162.023.  Plaintiffs have cited no law, and the Court has found none, that requires the Government to obtain consent from a majority of the allottees before removing trespassers from a highly fractionated allotment.

Importantly, this contrasts with the Government's responsibilities when approving a lease of highly fractionated trust land.  When more than twenty allottees share an interest in a given allotment, the BIA must obtain majority consent before

approving any lease of that land.  25 C.F.R. § 162.012.  Notably, it is undisputed that the BIA had the requisite consent of the allottee landowners when it approved the Master Lease in the 1980s.

Additionally, federal regulations provide that the BIA will not act to evict a holdover tenant if "the Indian landowners of the applicable percentage of interests under § 162.012 have notified [the BIA] in writing that they are engaged in good faith negotiations with the holdover lessee to obtain a new lease."  25 U.S.C. § 162.471.  Thus, the regulations provide a mechanism for allottee landowners to stop the eviction of holdover tenants, if the landowners want to negotiate a new lease with the holdover tenants.  In this case, it is undisputed that the landowners are not presently engaged in discussions with Wapato Heritage, or with Plaintiffs directly, about a new lease.

Plaintiffs and Wapato Heritage consistently, and quite emphatically, argue that the Government cannot have it both ways; they claim that the Government cannot maintain that allottee approval is required in some instances and not in others.  Again, Plaintiffs cite no law to support this assertion.

The relevant regulations explain when allottee consent is needed for the Government to act.  As stated above, here the regulations require the Government to obtain majority consent to approve a new lease; the regulations do not require the Government to obtain majority consent to eject trespassers.  Accordingly, the Court

1    rejects Plaintiffs' argument that the Government is somehow taking inconsistent

2    positions, or acting in bad faith, simply by complying with relevant regulations.[10]

3    **B. The Government's Trespass Counterclaim**

4    The Court turns to the merits of the Government's trespass claim, to

5    determine if the Government is entitled to summary judgment on that claim.  The

6    trespass claim is governed by federal common law.  *Pend Oreille Public Util. Dist.*

7    *No. 1*, 28 F.3d 1549 n.8 (explaining that federal law controls an action for trespass

8    on Indian land) (citing *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226,

9    234 (1985) (right of Indians to occupy lands held in trust by the United States for

10    their use is "the exclusive province of federal law")); *see also* 25 C.F.R. § 162.023

11    (What if an individual or entity takes possession of or uses Indian land without an

12    approved lease or other proper authorization?).

13    To prevail at the summary judgment phase on its trespass claim, the

14    Government must show that there are no genuine disputes of material fact, and that

15    it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex*

16    *Corp.*, 477 U.S. at 322–23.  Because the Government would have the burden of

17

18    [10] At the hearing, counsel for individual Defendant Gary Reyes asserted that the
     Government had improperly approved a sale of his beneficial interest in MA-8 to the
19    CTCR.  While the Court acknowledges the seriousness of Mr. Reyes's allegation that
     the Government did not fulfill its trust obligation with respect to the sale of his
20    beneficial interest in MA-8, Mr. Reyes's claim is not related to the claims of this
     case, which involve whether Plaintiffs have the right to occupy MA-8.
21

1    proof at trial on its trespass counterclaim, in order to succeed on summary judgment,

2    it must show that no reasonable trier of fact could find for Plaintiffs with respect to

3    that claim. *Ryan*, 584 Fed. App'x. at 406 (citing *Celotex Corp.*, 477 U.S. at 232).

4        It is undisputed that Plaintiffs have no lease or express easement authorizing

5    their use of MA-8. Plaintiffs first gained access to MA-8 via their camping

6    memberships. These camping memberships are contracts between Plaintiffs and

7    Evans/Wapato Heritage. There is no evidence that Plaintiffs have an agreement

8    with the Government or the individual allottee Defendants to use or occupy MA-8.

9        Plaintiffs' camping memberships gave them the right to use MA-8 consistent

10    with the Master Lease. The Ninth Circuit has held that the Master Lease expired as

11    of February 2, 2009. *See Wapato Heritage, LLC, v. United States*, 637 F.3d 1033,

12    1040 (9th Cir. 2011). While Wapato Heritage attempted to negotiate a new lease of

13    MA-8 at one point, it failed to do so.

14        There is no evidence demonstrating that the landowners have contacted the

15    BIA, consistent with 25 U.S.C. § 162.471, to inform the BIA that they are engaged

16    in good faith negotiations with Plaintiffs (or with Wapato Heritage) for a new lease.

17    It is undisputed that Plaintiffs are presently in possession of a portion of MA-8, and

18    that the allottees are out of possession, thereby unable to utilize that portion of MA-

19    8. The Government has met its burden to justify ejectment.

20

21

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS
FOR SUMMARY JUDGMENT ~ 65

Plaintiffs have asserted numerous defenses in an attempt to preclude the Government's Motion for Summary Judgment on its trespass claim.  The Court addresses each defense in turn.

**C. Plaintiffs' Estoppel Defense**

Plaintiffs raise the defense of equitable estoppel against the Government, to prevent it from ejecting them.  They claim that there are issues of material fact with respect to their estoppel defense that prevent summary judgment in the Government's favor.  However, the defense of equitable estoppel does not apply to the Government when it acts in its sovereign capacity as trustee for Indian land.  *See United States v. City of Tacoma, Wash.*, 332 F.3d 574 (9th Cir. 2003) (explaining that the government "is not at all subject" to the defense of equitable estoppel when acting as trustee of tribal land); *United States v. Antanum Irr. Dist.*, 236 F.2d 321, 334 (9th Cir.) *cert. denied* 352 U.S. 988 (1957); *State of New Mexico v. Aamodt*, 537 F.2d 1102, 1110 (10th Cir. 1976) (explaining that "[e]stoppel does not run against the United States when it acts as trustee for an Indian tribe).

Here, the Government is acting in its trust capacity by seeking the removal of Plaintiffs from Indian trust land.  Accordingly, Plaintiffs, as a matter of law, cannot assert the defense of equitable estoppel to combat the Governments' trespass claim.

Plaintiffs have attempted to get around this legal principle by asserting their defense of equitable estoppel against the individual landowners directly, in addition to the Government.  However, the Government acting in its trust capacity has filed

the trespass counterclaim against Plaintiffs.  Therefore, the defense raised against

individual landowners is not applicable to the Government's counterclaim, as a

matter of law, and Plaintiffs do not create any issues of material fact by asserting the

defense.

### D. Plaintiffs' Irrevocable License and Easement by Estoppel Defenses Raised in Plaintiffs' 2012 Briefing

Plaintiffs also defend against the Government's trespass claim by arguing that

they have an "irrevocable license" under Washington law to remain on the property

until 2034.  This argument was raised in Plaintiffs' briefing in 2012 and was not

argued during the 2020 hearing.

The concept of an "irrevocable license" is not well-developed in Washington

State, and Plaintiffs do little to explain how the concept has been applied by

Washington courts in their briefing.  However, Plaintiffs maintain that their

purported irrevocable license may be better described as an easement by estoppel.

In raising their "irrevocable license" and "easement by estoppel," defenses, Plaintiffs

essentially reassert their equitable estoppel claim, which the Court has rejected as a

matter of law.

Even if these state property law defenses should be evaluated separately from

Plaintiffs' equitable estoppel claim against the Government, they still are not

applicable to this action, which is governed by federal law.  As *Cohen's Handbook*

explains, "Because Indian land claims are 'exclusively a matter of federal law,' state

property laws are preempted." *Cohen* § 15.08[4] (citing *County of Oneida v. Oneida Indian Nation*, 470 U.S.226, 241 (1985)). "This means, for example, that state statutes of limitations and adverse possession doctrines do not apply to tribal lands. In addition, other state-law based defenses to possessory claims, such as estoppel and laches, are similarly preempted." *Id*. (citing *County of Oneida v. Oneida Indian Nation*, 470 U.S.226, 241 n.13 (1985)); *see also United States v. Ahtanum Irr. Dist.*, 236 F.2d 321 (9th Cir. 1956) (explaining that no defense of laches or estoppel was available against the Government when the Government acted as trustee for an Indian tribe); *Seneca Nation of Indians, Tonawanda Bank of Seneca Indians v. New York*, No. 93–CV–688A, 1994 WL 688262, at *1 (W.D.N.Y. Oct. 24, 1994) (striking the state-law defenses of accord, satisfaction, unclean hands, estoppel, laches, and waiver because their assertion would "contravene established policy pertaining to Indians' ability to enforce their property rights").

These defenses, which are grounded in state law, are inapplicable here. Therefore, by asserting these defenses, Plaintiffs do not create any issues of material fact that preclude summary judgment on the Government's trespass counterclaim.

### E. Plaintiffs' Specific Performance Argument Raised in Plaintiffs' 2012 Briefing

Plaintiffs also argue that summary judgment on the Government's ejectment counterclaim should be denied because Plaintiffs may be entitled to the equitable remedy of specific performance on either their camping contracts or on the 2004

Settlement Agreement, thus allowing them to remain on MA-8 until 2034.  Again, Plaintiffs raised this argument in 2012 but did not address it at the hearing in 2020.

"Specific performance is an equitable remedy available to an aggrieved party for breach of contract where there is no adequate remedy at law." *Kovanen v. FedEx Ground Package Systems, Inc.*, 2:17-CV-00360-SMJ, 2018 WL 660634, at *2 (E.D. Wash. Feb. 1, 2018) (quoting *Egbert v. Way*, 546 P.2d 1246, 1248 (Wash. Ct. App. 1976)).   Plaintiffs argue that they may have an enforceable oral contract with the individual allottee Defendants that entitles them to specific performance in this case.

Plaintiffs cite to *Canterbury Shores Associates v. Lakeshore Properties, Inc.*, 572 P.2d 742 (Wash. Ct. App. 1977), to argue that a court may enforce an oral contract for the conveyance of an interest in real property under certain circumstances, even though such a contract usually must be in writing pursuant to the statute of frauds.  ECF No. 295 at 19.  In that case, the Washington Court of Appeals explained that a court of equity may enforce a parol contract for the conveyance of an interest in land when there has been part performance, and when the contract can "be established by clear and unequivocal proof, leaving no doubt as to the character, terms, and existence of the contract." *Canterbury Shores Assocs.*, 572 P.2d at 744.

Here, Plaintiffs have produced no evidence of a contract between them and the individual allottee Defendants.  The contracts that Plaintiffs want to enforce,

which are their camping memberships and the 2004 Settlement Agreement, are between them and Evans/Wapato Heritage, not the allottee Defendants.

Additionally, the Court notes the peculiar context in which Plaintiffs argue for specific performance, as Plaintiffs did not bring any contract claim against the individual allottee Defendants in this case. However, as the parties did not address or argue this issue, the Court makes no findings as to whether Plaintiffs appropriately raised their specific performance argument.

Because Plaintiffs have provided no evidence of a contract between them and the individual allottee Defendants, their specific performance argument does not preclude summary judgment on the Government's trespass counterclaim.

None of Plaintiffs' defenses raise issues of material fact precluding summary judgment on the Government's trespass counterclaim. Moreover, the undisputed material facts illustrate that the Government is entitled to judgment as a matter of law on that counterclaim.

Accordingly, **IT IS HEREBY ORDERED:**

1. For good cause shown, the individual Defendants' Motion and Memorandum Joining in the Federal Defendants' Motion for Summary Judgment re Ejectment, **ECF No. 344**, is **GRANTED**.

2. Plaintiffs' Motion for Default Judgment, **ECF No. 433**, is **DENIED**.

3. Plaintiffs' Motion for Summary Judgment, **ECF No. 439**, is **DENIED**.

4.  The Government's Renewed Motion for Summary Judgment re Ejectment, **ECF No. 231**, is **GRANTED**.

5.  Plaintiffs have had no right to occupy any portion of MA-8 after February 2, 2009.  Plaintiffs are in trespass, and their removal from the subject property is authorized.

6.  Judgment shall be entered for the Government (Federal Defendants) on its trespass counterclaim.

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order and provide copies to counsel and pro se Defendants.

**DATED** July 9, 2020.

*s/ Rosanna Malouf Peterson*
ROSANNA MALOUF PETERSON
United States District Judge

ORDER RESOLVING MOTION FOR DEFAULT JUDGMENT AND MOTIONS FOR SUMMARY JUDGMENT ~ 71